In re OMNI MECHANICAL CONTRACTORS, INC., Debtor.

Scott N. BROWN Jr., Trustee, Plaintiff,

v.

Joel C. RILEY and Power Management, Inc., d/b/a Steam Sales, Defendants.

Bankruptcy No. 1–87–01179.
Adv. No. 1–89–0194.

United States Bankruptcy Court,
E.D. Tennessee.

April 25, 1990.

520

Richard P. Jahn, Jr., Chattanooga, Tenn., for plaintiff-trustee.

Thomas E. Ray, Chattanooga, Tenn. and David F. Harrod, Athens, Tenn., for defendants.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This case is before the court upon the trustee's complaint to recover moneys from defendants Joel C. Riley and Power Management, Inc. under several theories predicated upon bankruptcy and state law. Having considered the evidence introduced at the trial, and having further considered the briefs filed by counsel, the court now submits its findings of fact and conclusions of law pursuant to Bankr.R. 7052.

The debtor, Omni Mechanical Contractors, Inc. (herein "Omni"), was a mechanical contracting firm formed in May 1984. Omni was incorporated as a Tennessee corporation, and the three original directors and shareholders were Riley, chairman of the board and president; J.R. Jones, secretary-treasurer; and Richard Spears, vice president. Riley and Jones were issued 200 shares of Omni stock and contributed $20,000 each. Spears was issued 50 shares, although it is unclear whether Spears made a capital contribution. Up until January 1986, the day-to-day opera-

tions of Omni were conducted either by Riley or Spears or both.

On January 13, 1986, Riley and Jones sold their 200 shares of stock back to Omni. Jones tendered his resignation from Omni's board of directors at that time. On January 14, 1986, Mike McCullough, a project supervisor for Omni, and Spears became major shareholders of Omni, each holding 225 shares. Riley was given back 50 shares for a nominal consideration to remain as a director of Omni with McCullough and Spears.

During the first few months of 1986, Omni's financial condition rapidly deteriorated. Omni was unable to collect several large receivables and it began experiencing cash flow shortages. From February through May of 1986, Omni paid out $722,957, but only had receipts of $458,137. On May 22, 1987, Omni filed a petition for relief under the provisions of chapter 11 of the Bankruptcy Code. On January 4, 1989, Omni's case was converted to one under chapter 7. The chapter 7 trustee subsequently initiated this adversary proceeding against the defendants alleging a number of claims for which the trustee seeks recovery. Those claims are set out below and generally seek from the defendants the following:

1. $8,800 from Riley for alleged misappropriation of corporate funds on or about April 4, 1985;

2. $2,625 from Riley for alleged misappropriation of corporate funds on October 8, 1985;

3. $18,000 from Riley for the transfer of a Mercedes to Riley which constituted an alleged preferential transfer or a fraudulent conveyance;

4. $38,000 plus profit from Riley for a shop building constructed by Omni for Riley in Riceville, Tennessee, which constituted an alleged fraudulent conveyance;

5. $9000 from Riley for the transfer of a 1985 Ford F–250 truck to Riley which constituted an alleged preference;

6. $16,000 from Riley for the transfer of a 1979 International tractor to Riley and Bob Harris which constituted an alleged preference;

7. At least $190,000 from Riley and Power Management for lost profits payable to Omni for constructing the Power Management steam plant because of Riley's alleged improper self-dealing;

8. $38,904.05 from Riley for unauthorized and undeserved salary withdrawals in January of 1985 and 1986.

The facts pertinent to each of the trustee's claims will be discussed separately. As a preliminary matter, since many of the trustee's claims hinge on Omni's insolvency as of January 1986, the court will address Omni's financial condition during that time period.

### Omni's Financial Condition

A substantial amount of evidence was introduced by the trustee in an attempt to show Omni was insolvent at the time or became insolvent as a result of transfers of Omni assets to Riley. According to the trustee's theory, Omni was insolvent at least from January 1986 forward.

Insolvency is defined in the Bankruptcy Code at 11 U.S.C.A. § 101(31) as follows:

(31) "insolvent" means—

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C.A. § 101(31)(A) (West Supp.1989). The Bankruptcy Code utilizes a balance-sheet analysis in determining insolvency of a debtor. In evaluating the debtor's assets and liabilities, the court is required to attribute a "fair valuation" to the debtor's property. A fair valuation, which is not synonymous with liquidation value, "has been interpreted to mean the amount which can be realized from the assets within a

reasonable time." *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 299 (Bankr.D.Mass.1983), *aff'd*, 776 F.2d 379 (1st Cir.1985). For the court to make a fair valuation of the debtor's property, it may be appropriate to reduce or eliminate the value of assets which cannot be made available for payment of debts within a reasonable time. The value of accounts receivable may be discounted for uncollectible and disputed debts. *Id.; see Construc-tora Maza v. Banco de Ponce*, 616 F.2d 573 (1st Cir.1980); *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 71 B.R. 351 (Bankr.E.D.Tenn.1987) (Bare, J.).

The beginning point for determining Omni's financial condition in January 1986 is an audit report prepared by Mordt, Davis & Co. showing Omni's condition as of January 31, 1986. The assets and liabilities of Omni at that time, were shown by the auditor as follows:

| CURRENT ASSETS: | |
|---|---|
| Cash | $218,315 |
| Receivables— | |
| Progress billings on contracts (Note A–1) | 474,806 |
| Unbilled revenues on contracts (Note A–1) | |
| Prepaid expenses | 3,427 |
| TOTAL CURRENT ASSETS | 696,548 |
| NOTE RECEIVABLE—STOCKHOLDER (Note C) | 47,750 |
| PROPERTY AND EQUIPMENT (Notes A–2 and B), | 94,814 |
| Less accumulated depreciation | −26,298 |
| | 68,516 |
| RECEIVABLE FROM COMPLETED CONTRACT (Note D) | 308,036 |
| Less payable to former stockholders (Note D) | 308,036 |
| | $812,814 |
| CURRENT LIABILITIES: | |
| Trade accounts payable | $476,598 |
| Accrued expenses | 50,320 |
| Advance billings on contracts (Note A–1) | 64,831 |
| Income taxes (Note A–3) | 56,775 |
| Current portion of long-term debt | 14,846 |
| TOTAL CURRENT LIABILITIES | $663,370 |

The evidence presented at trial indicates some adjustments are necessary to make the audited financial statement properly reflect Omni's true financial condition.

A. *Assets*

1. Cash

The parties agree Omni had cash in the amount of $218,315 as shown by the auditor.

2. Receivables

*a. Union Boiler Receivable:* Included within the accounts receivable figure of $474,806 was a receivable from a job Omni performed for Union Boiler at a TVA steam plant in Gallatin, Tennessee. The Union Boiler receivable was listed by the auditor at $125,000. Because Omni incurred additional costs in performing this contract, which costs were borne by Omni and owed to Union Boiler or a subsidiary of Union Boiler, the receivable was subject to a setoff. On August 1, 1987, during Omni's chapter 11 case, Omni credited Union Boiler for certain claims in the net amount of $109,129.59. In 1989, the chapter 7 trustee ultimately collected $36,000 plus interest from the Union Boiler receivable.

The court finds that no funds from the Union Boiler account were received and available for creditors within a reasonable time after January 1986. Therefore, the $125,000 Union Boiler receivable will be deducted from Omni's accounts receivable.

*b. Riceville Shop Receivable:* The trustee also seeks to adjust receivables by adding $30,000 for a payment made by Riley on March 3, 1986. Riley's $30,000 payment was for construction of the shop building on his property in Riceville, Tennessee. Apparently, the auditor was unaware that this receivable was due from Riley as Omni's costs for the construction were not properly listed under the correct job number (Job No. 86–004). The court will add $30,000 to accounts receivable representing Riley's debt to Omni.

*c. Power Management Receivable:* The defendants acknowledge in their adjusted balance sheet $8,000 should be deducted from the receivable listed for the Power Management job. However, Gena Cavett, Omni's bookkeeper, testified that the Power Management receivable listed by the auditor at $93,000 was actually received in the amount of $83,000. Based upon Cavett's testimony, accounts receivable will be reduced by $10,000.

With adjustments, Omni's January 31, 1986, accounts receivable figure should be $369,806.

### 3. Prepaid Expenses

The parties agree that Omni had prepaid expenses in the amount of $3,427 as shown by the auditor.

### 4. Notes Receivable—Stockholder

The auditor listed a note receivable from Spears for $47,750. This note represented labor and materials provided by Omni to Spears for construction work on his home. Testimony indicated the Spears' note was created at the suggestion of the auditor. Riley testified that Spears probably did not owe the amount of the note because Spears had accrued salary and bonuses which would more than offset the amount of the note. In any event, the Spears' note was never collected. In May 1986, Spears left

Omni and in exchange for return of his stock certificate, Spears obtained the cancellation of the note. The trustee has filed an action against Spears seeking recovery of the value of the note.

The court finds the Spears' note was created primarily to enhance Omni's balance sheet and proceeds from the note were unavailable to creditors within a reasonable time. The court will eliminate the Spears' note from the balance sheet.

### 5. Property and Equipment

The auditor listed property and equipment (depreciated) of Omni at a value of $68,576. Included within the value for property was a 1982 Mercedes which Omni had purchased in April 1985 for Riley's use. Omni's property (automobiles and trucks) and equipment was purchased at a cost of $94,814. The auditor did not include any inventory within the figure of property and equipment. The trustee concedes a fair valuation of the property and equipment of Omni would be $75,000. The trustee's valuation includes the value attributed to the Mercedes.

The auditor was unaware of the secret arrangement made by Riley and Jones with regard to their stock repurchase. The testimony indicates, however, that for all practical purposes, Omni transferred ownership of the Mercedes to Riley as of January 13, 1986. Therefore, inclusion of the value of the Mercedes within Omni's property and equipment figure was error.

Notwithstanding that Riley credited Omni $20,000 for his receipt of the Mercedes, the testimony indicates and the court finds a fair valuation of the Mercedes at the time of the transfer was $15,000. Accepting a $75,000 valuation for Omni property and equipment including the value of the Mercedes, the court finds that Omni's property and equipment as of January 31, 1986, should be valued at $60,000.

There was also testimony by Riley that Omni had miscellaneous materials and tools that were not included in the auditor's figures which would have increased the property and equipment value on the financial

statement by $30,000. Riley, however, did not offer an itemization of this other property and equipment nor did he offer any other proof to substantiate his assertion that Omni had additional materials and tools. Thus, the court is unwilling to increase Omni's property and equipment value above the $60,000 figure.

6. Total Assets

With adjustments, Omni's total assets as of January 31, 1986, were $651,548.

B. *Liabilities*

1. Trade Accounts Payable

a. *Stipulations:* The parties have stipulated that $24,000 should be added to the auditor's figure for trade accounts payable.

b. *Riceville Shop Payable:* In conjunction with the $30,000 increase in accounts receivable for the Riceville shop construction, the trustee asserts that the following expenses be carried as payables for that job as of January 31, 1986: (1) $15,807 for a shear machine Omni purchased on February 6, 1986, that was not reflected in the Omni disbursements ledger; and (2) $40,-445.80 in disbursements on the Riceville shop building made between February and April 1986.

The auditor's work papers show that a $15,800 debt due to Bill Harrell was listed in Omni's January 1986 trade accounts payable. This figure matches the purchase price Omni paid for the shear machine. The auditor's work papers further indicate that Omni made payment of $15,800 on February 5, 1986, which date coincides with the wire transfer made to Harrell by Omni for the shear machine. The court will not increase trade accounts payable for the value of the shear machine.

The trustee also seeks to increase trade payables for disbursements on the Riceville shop building made between February and April 1986. Approximately $41,445 was

paid from February to April on the Riceville shop building. It appears from the auditor's work papers and exhibit 16 that $1,776 of the $41,445 spent may have been listed as payables on the balance sheet of January 31, 1986. According to Riley's testimony, the Riceville shop project was basically complete in January 1986. Further, as of January 13, 1986, Riley knew he had a $38,000 balance remaining from the $106,000 cost of the Riceville shop project. These facts indicate the costs on the Riceville shop project had been incurred as of January 1986 and should have been included on the auditor's balance sheet as trade accounts payable.[1] The court concludes Omni's trade payables should be increased to reflect payables unknown to the auditor in the amount of $39,669.

c. *Don Fillers' Payable:* The trustee asserts that trade accounts payable should be increased by $5,000 to reflect the finder's fee (kickback) owed to Don Fillers of Boiler & Heat Exchange (B & H). Fillers had helped Omni obtain several contracts with B & H in the past in exchange for kickbacks from Riley. In this particular transaction, Fillers had informed Riley of a TVA job being bid at Norris, Tennessee. In exchange for Fillers' information and help with bid preparation, Riley agreed to pay Fillers over $8,000. In April 1985, Omni paid Fillers $3,713.50 as part of the finder's fee. At the suggestion of Riley, Fillers was paid the remaining $5,000 balance on March 6, 1986. Fillers' arrangement with Riley was not known or accounted for by the auditor.

The court agrees that the debt Omni owed to Fillers should have been listed in Omni's January 1986 trade accounts payable. Accordingly, $5,000 will be added to trade accounts payable.

d. *Johnson Paving Payable:* Finally, the trustee proposes to increase trade payables by $10,834 for a paving debt incurred

---

**1.** The auditor was likely unaware of the Riceville shop payables because of Omni's practice of mischarging invoices to wrong job numbers. The proof showed when Omni began construction on the Riceville shop project, there was no job number assigned to it. Accordingly, many of the costs associated with the Riceville shop project were put on other projects and may not have been detectible by the auditor. At some point in 1986, Omni did create a separate job number for the Riceville shop project.

on Omni's Power Management job. Omni wrote a check for this amount on March 6, 1986, to Johnson Paving Company. Apparently, the check was not delivered or not collectible, as the evidence indicates Power Management paid the same amount to Johnson Paving Company on April 8, 1986. As discussed below in the trustee's claim no. 6, Omni transferred a 1979 International tractor to satisfy this debt. Testimony indicates that Omni incurred most of its costs on the Power Management job before February 1986; however, Omni still performed work on the Power Management job after January 31, 1986. The court is unable to determine from the evidence before it when the paving debt was incurred. The $10,834 paving debt will not be added to trade accounts payable.

*e. Union Boiler Payable:* The defendants seek to reduce trade payables by $63,626.06. This figure represents Omni's debt to Union Boiler and its subsidiary, Nitro Electric, as of January 31, 1986. The defendants assert these payables were set off against the $125,000 receivable due from Union Boiler in the settlement of August 1, 1987.

The auditor's work papers show payables to Union Boiler ($11,683.70) and to its subsidiary, Nitro Electric ($51,942.30) as of January 31, 1986. It appears Omni did pay Union Boiler $9,021 and Nitro Electric $4,413 on February 1, 1986. The remaining balance of $50,190.75 appears to have remained outstanding, as Omni's disbursement ledger does not indicate any further payments on these accounts.

Although the Union Boiler payable was and continued to be a liability of Omni that was finally settled during the course of Omni's chapter 11 case, the settlement consisted of offsetting the Union Boiler payable against the Union Boiler receivable that the court eliminated from Omni's balance sheet because it was not available to creditors within a reasonable time. Since the payable was ultimately set off by a stale receivable that the court has removed from the asset side of the balance sheet,

the court, in the interests of fairness and caution, will not count the $50,190.75 payable in its balance-sheet analysis. Hence, only for purposes of calculating whether Omni was insolvent in January 1986 and in light of the elimination from the balance sheet of the Union Boiler receivable, the trade accounts payable will be reduced by $50,190.75.

With adustments, Omni's trade accounts payable balance as of January 31, 1986 was $495,076.

**2. Accrued Expenses**

The parties agree Omni had accrued expenses in the amount of $50,320 as shown by the auditor.

**3. Advance Billings on Contracts**

The parties agree Omni had advance billings on contracts in the amount of $64,831 as shown by the auditor.

**4. Income Taxes**

The trustee asserts the auditor's figure for Omni's income tax should be reduced to $28,164, which was the actual figure reported to the Internal Revenue Service. The court agrees that Omni's actual reported income tax figure should be used; therefore, the court will reduce the income tax liability to $28,164.

**5. Long Term Debt**

The parties agree Omni had long-term debt in the amount of $14,846 as shown by the auditor.

**6. Jones' and Riley's Notes**

As mentioned earlier, on January 13, 1986, Riley and Jones sold their 200 shares of stock back to Omni. The auditor understood, and the corporate minutes reflected, each person's shares would be repurchased for $25,000 per person. In actuality, Jones and Riley were each to receive $80,000 in exchange for their shares.[2] Riley received the 1985 Mercedes in lieu of $20,000 cash; a credit for $38,000 owed to Omni for con-

---

**2.** Jones and Riley also received for their shares the joint assignment of Omni's Biomass account receivable, which was valued on Omni's books at $308,000.

struction of the building on his Riceville property; and a note from Omni for approximately $22,000. Jones received $25,000 in cash which was reflected in the auditor's statement and a note from Omni for $55,000. The notes payable to Jones and Riley were unknown to the auditor and were not reflected in the January 31, 1986, financial statements.

The notes to Riley and Jones, if known to the auditor, would have been Omni liabilities on the balance sheet. The court accordingly adds $77,000 to the liabilities of Omni.

### 7. Total Current Liabilities

With adjustments, Omni's total current liabilities as of January 31, 1986, were $730,237.

As a result of the adjustments described above, the resulting Omni balance sheet as of January 31, 1986, looks as follows:

| | |
|---|---:|
| **CURRENT ASSETS:** | |
| Cash | $218,315 |
| Receivables— | |
| Progress billings on contracts | 369,806 |
| Unbilled revenues on contracts | |
| Prepaid expenses | 3,427 |
| TOTAL CURRENT ASSETS | 591,548 |
| NOTE RECEIVABLE—STOCKHOLDER | –0– |
| PROPERTY AND EQUIPMENT | 75,000 |
| Less Mercedes transferred to Riley | –15,000 |
| | 60,000 |
| RECEIVABLE FROM COMPLETED CONTRACT | 308,000 |
| Less payable to former stockholders | 308,000 |
| TOTAL ASSETS | $651,548 |
| **CURRENT LIABILITIES:** | |
| Trade accounts payable | $495,076 |
| Accrued expenses | 50,320 |
| Advance billings on contracts | 64,831 |
| Income taxes | 28,164 |
| Current portion of long-term debt | 14,846 |
| NOTES PAYABLE—Stockholder | 77,000 |
| TOTAL CURRENT LIABILITIES | $730,237 |

According to Omni's adjusted balance sheet as of January 31, 1986, the court determines that Omni's debts exceeded its assets, at fair valuation, rendering Omni insolvent.

Omni's balance sheet just prior to the stock repurchase of January 13, 1986, differs from the adjusted balance sheet for January 31, 1986, as follows:[3]

### A. *Assets*

#### 1. Cash

The $25,000 payment made to Jones on January 14, 1986, would be added back to cash.

#### 2. Accounts Receivable

Although Omni would have been entitled to a $38,000 credit on its accounts receiva-

---

**3.** The testimony indicates that Omni's financial position did not vary significantly from the time of the stock repurchase until January 31, 1986. *See Foley v. Briden (In re Arrowhead Gardens,*

*Inc.),* 32 B.R. 296, 300–01 (Bankr.D.Mass.1983), *aff'd,* 776 F.2d 379 (1st Cir.1985) (retrojection technique applied).

ble from Riley for the Riceville shop building, the court will not add this amount to the January 13 value of Omni's assets as that amount was never paid or available to creditors within a reasonable time.

The $308,000 Biomass receivable which Omni transferred to Jones and Riley at the time of the January 13, 1986, stock repurchase was never collected and will not be considered an asset of Omni as of January 13, 1986.

### 3. Property and Equipment

The $15,000 value of the Mercedes transferred to Riley would be added back to the property and equipment total.

### 4. Total Assets

With adjustments, Omni's total assets as of January 13, 1986, were $691,548.

### B. *Liabilities*

### 1. Notes Payable

The only change in liabilities of Omni prior to the stock repurchase would be the elimination of the $77,000 notes payable to Jones and Riley.

### 2. Total Current Liabilities

With adjustments, Omni's total current liabilities as of January 13, 1986, were $653,237.

The Omni balance sheet as of January 13, 1986, looks as follows:

CURRENT ASSETS:

| | |
|---|---|
| Cash | $243,315 |
| Receivables— | |
| Progress billings on contracts | 369,806 |
| Unbilled revenues on contracts | |
| Prepaid expenses | 3,427 |
| TOTAL CURRENT ASSETS | 616,548 |
| NOTE RECEIVABLE—STOCKHOLDER | –0– |
| PROPERTY AND EQUIPMENT | 75,000 |
| TOTAL ASSETS | $691,548 |
| CURRENT LIABILITIES: | |
| Trade accounts payable | $495,076 |
| Accrued expenses | 50,320 |
| Advance billings on contracts | 64,831 |
| Income taxes | 28,164 |
| Current portion of long-term debt | 14,846 |
| TOTAL CURRENT LIABILITIES | $653,237 |

From Omni's balance sheet as of January 13, 1986, the court finds Omni's assets, at fair valuation, exceeded its liabilities by approximately $38,000.

With the consummation of Omni's repurchase of Jones and Riley's stock on January 13, 1986, Omni's balance sheet conformed to the January 31, 1986, analysis the court made above. After January 31, 1986, Omni's financial condition deteriorated even more. From February to May of 1986, Omni's cash disbursements exceeded its cash receipts by more than

$264,000. Omni's receivables were not being paid promptly, and Omni was unable to obtain any projects of over $100,000, which would have improved Omni's cash flows.

In May 1986, McCullough constructed a financial statement for Omni as of May 18, 1986. Omni only had $15,000 in cash. Equipment would have been basically the same as the figure for January 31, 1986. McCullough listed accounts receivable, including work in process, of $556,947. Approximately $213,000 of these receivables were never collected. The Spear's note

was not included by McCullough as an asset. These figures indicate Omni's cash and accounts receivable, adjusting for the uncollectible accounts, were $229,000 less than the January 31, 1986 figures. Omni's total assets approximated $419,000.

Omni's liabilities as of May 18, 1986, consisted mainly of trade accounts payable, including payroll expenses through the end of May, in the amount of $586,395. The notes payable to Jones and Riley were also obligations of Omni at this time. Omni's total liabilities exceeded $600,000, indicating an excess of liabilities over assets of at least $181,000 as of May 18, 1986.

*Claim No. 1*

■ The trustee seeks recovery of an $8,800 payment made by B & H to Riley as an alleged unauthorized appropriation of Omni assets.

In early 1985, Omni had a contract with B & H to do work for Shaw Carpet Company. Omni had performed some extra work on the contract and was owed in excess of $8,800. As partial payment, B & H paid a check for $8,800 directly to Riley on April 4, 1985. Riley endorsed the check over to his son. Riley did not report the $8,800 payment on his 1985 income tax return.[4]

There were no corporate minutes reflecting Omni's authorization for Riley to receive these funds. Riley testified that Jones, Spears, and himself all understood that 5% bonuses would be paid to Riley and Spears from profits on certain jobs. The $8,800, according to Riley, was part of an accrued bonus earned from Riley's work on several of Omni's projects in Florida. Riley admitted that payments received in this manner were efforts by the three men to avoid personal income taxes.

In contrast to Riley's testimony, Jones has filed an action against Riley in which Jones claims he had no knowledge of the $8,800 payment received by Riley. Furthermore, in the summer of 1985, while Jones and Riley were negotiating a buy out of Jones' Omni stock, Riley prepared a financial statement of Omni as of July 12, 1985. The financial statement listed Ri-

ley's accrued bonuses to that point, but failed to credit the $8,800 payment received from B & H against Riley's accrued bonuses.

The only evidence presented to the court to justify Riley's receipt of the $8,800 payment from B & H was Riley's own testimony. No testimony of other Omni executives, written documentation, or corporate records corroborate Riley's testimony. Furthermore, Riley's testimony at times was contradictory and unbelievable. Riley at one point admitted he filed a false affidavit in this court in support of a motion for partial summary judgment.

Riley's manner of receiving the $8,800 payment, his accounting of the money for tax purposes, and his omission of the payment when discussing a buy-out proposal for Jones' stock lead the court to conclude Riley misappropriated these funds.

The court finds Riley breached his fiduciary duty by diverting a receivable of Omni from B & H for his personal use. *See Henderson v. Buchanan (In re Western World Funding)*, 52 B.R. 743, 763–64 (Bankr.D.Nev.1985); *Central Bus Lines v. Hamilton Nat'l Bank*, 34 Tenn.App. 480, 485, 239 S.W.2d 583, 585 (1951). Riley's actions amounted to a conversion of Omni assets, and as such, should be considered as being held in trust and recoverable by the trustee. *Henderson v. Buchanan*, 52 B.R. at 763–64; *see McLemore v. Olson (In re B & L Laboratories)*, 62 B.R. 494, 509–10 (Bankr.M.D.Tenn.1986) (constructive trusts); *Central Bus Lines*, 34 Tenn.App. at 486, 239 S.W.2d at 585–86. *See generally Gillespie v. Branham*, 47 Tenn.App. 234, 337 S.W.2d 689 (1959).

*Claim No. 2*

■ The trustee seeks recovery of expenses incurred by Omni for a hunting trip on which Riley allegedly misappropriated funds by entertaining persons other than Omni customers.

In October 1985, Riley took three persons with him, at Omni's expense, to Colorado on a guided hunting trip. Two of the men accompanying Riley were customers

---

**4.** Riley testified he did report the $8,800 payment on his 1987 income tax return.

of Omni. The third man, Roy Harmon, an officer of First American National Bank in Knoxville, was not the banker who regularly conducted business with Omni. In fact, it appears that Harmon was the banker who worked with Riley's other company, Power Management, and helped Riley obtain the construction loan for Power Management's North Carolina steam plant. Omni paid $2,625 for the hunting trip.

Riley testified that while on the trip, Harmon had partially repaid Omni for a portion of his expenses by paying for everyone's meals. No dollar amounts were given as to the amounts repaid by Harmon.

The trustee asserts that Harmon's expenses are properly chargeable to Power Management, and as such, seeks reimbursements for one-quarter of Omni's costs for the hunting trip.

While it may be true Omni normally dealt with another officer of First American, the court does not find the $654 expended by Omni on Harmon should be repaid by Riley or Power Management. Omni maintained banking relations with First American in Cleveland, and the contacts with Harmon at First American in Knoxville were not unrelated to Omni's business. Furthermore, Omni had an indirect interest in Harmon's dealings with Riley and Power Management concerning the construction funds required by Omni to build Power Management's steam plant. The relatively small expense Omni incurred as a result of the hunting trip was not inappropriate in light of the potential earnings Omni expected to generate from its contract on the Power Management project. The trustee will not be allowed to recover on this claim.

*Claim No. 3*

As part of the $80,000 payment made by Omni to repurchase Riley's stock, Riley was given a 1982 Mercedes Omni had purchased for his use. The court has valued the Mercedes at $15,000 as of January 13, 1986.

On January 13, 1986, all parties involved in the stock repurchase intended that Riley was to become the owner of the vehicle at that time. Riley had possession and contin-uous use of the vehicle after January 13. Riley did not actually receive the title from Omni until May 1985, and an application for title in Riley's name was not filed with the state of Tennessee until October 3, 1986.

The trustee seeks reimbursement for the value of the automobile on several theories. First, the trustee alleges the transfer of the Mercedes was a preferential transfer under 11 U.S.C.A. § 547; second, the trustee alleges the transfer of the Mercedes was a fraudulent conveyance under 11 U.S.C.A. § 548; third, the trustee alleges the transfer of the Mercedes should be set aside under relevant portions of Tennessee's Fraudulent Conveyance Act; and fourth, the trustee alleges the transfer of the Mercedes should be set aside under relevant portions of Tennessee's former Business Corporation Act.

The court finds the transfer of ownership of the Mercedes from Omni to Riley occurred on January 13, 1986. Notwithstanding the certificate of title was not conveyed to Riley until May of 1985, Tennessee's certificate of title laws do not require the transfer of an ownership interest in an automobile be accompanied by a transfer of the certificate of title. *See Norwood v. Crabtree (In re Crabtree),* 39 B.R. 713 (Bankr.E.D.Tenn.1984) (Bare, J.); *Smith v. Smith,* 650 S.W.2d 54 (Tenn.Ct. App.1983): *Hayes v. Hartford Accident & Indemnity Co.,* 57 Tenn.App. 254, 417 S.W.2d 804 (1967). *See generally* Tenn. Code Ann. § 47–2–401 (1979) (sales of goods).

Since the transfer of the Mercedes to Riley occurred more than one year before Omni filed for bankruptcy, the trustee may not set aside the transfer under 11 U.S. C.A. §§ 547 or 548. Those sections of the Bankruptcy Code require the transfer take place within one year prior to the filing of the bankruptcy petition. 11 U.S.C.A. §§ 547(b)(4), 548(a) (West Supp.1989).

The trustee, however, may recover the value of the Mercedes under Tennes-

see's Fraudulent Conveyances Act.[5] Sections 66–3–305 and 66–3–306 of the Act state as follows:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Tenn.Code Ann. § 66–3–305 (1982).

> Every conveyance made without fair consideration, when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands, after the conveyance, is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual interest.

*Id.* § 66–3–306.

Insolvency is defined in § 66–3–302 of the Act as follows:

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

*Id.* § 66–3–302.

Fair consideration is defined in § 66–3–304 as follows:

> Fair consideration is given for property, or obligation:
>
> (1) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or
>
> (2) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as

compared with the value of the property or obligation obtained.

*Id.* § 66–3–304.

For the trustee to prevail under § 66–3–305, the trustee must prove that Omni was insolvent at the time of or became insolvent as a result of the transfer and that Omni did not receive fair consideration in exchange for the Mercedes. For the trustee to prevail under § 66–3–306, the trustee must prove that after the January 13 transfers Omni was left with unreasonably small capital with which to continue its business.

Concerning Omni's insolvency, the court has already determined Omni was balance-sheet insolvent as a result of the January 13 stock repurchase in that Omni had liabilities which exceeded its assets by nearly $80,000 after that transaction. The trustee does not, however, rely upon the balance-sheet test for insolvency; rather the trustee relies on district court opinions in this district in which the determination of insolvency under § 66–3–302 is said to be through application of the equity-insolvency test, namely, whether the transferor is able to meet its obligations as they come due in the ordinary course of business. *See Seals v. Sears, Roebuck & Co.,* 688 F.Supp. 1252 (E.D.Tenn.1988) (Edgar, J.); *Cate v. Nicely (In re Knox Kreations, Inc.),* 474 F.Supp. 567 (E.D.Tenn.1979) (Taylor, J.), *aff'd in part, rev'd in part,* 656 F.2d 230 (6th Cir.1981). *But see John Ownbey Co. v. Commissioner,* 645 F.2d 540 (6th Cir.1981); *Hyde Properties v. McCoy,* 507 F.2d 301 (6th Cir.1974). Even under the equity-insolvency test, Omni was insolvent at the time of or as a result of the stock repurchase of January 13, 1986.

■ The equity-insolvency test is not a bright line test. A corporation operating as a going concern under normal conditions with significant shareholder equity is a strong indication that no issue should arise under this test. In contrast, a corporation

---

**5.** Section 544(b) of the Bankruptcy Code allows the trustee to avoid any transfer that is voidable under applicable law by any actual creditor with an allowable unsecured claim. 11 U.S.C.A. § 544(b) (West 1979). Union Boiler or its subsidiary was, at the time of the disputed transfer, an unsecured creditor who later possessed an allowable claim in Omni's bankruptcy case as evidenced by Omni's settlement agreement with Union Boiler on August 1, 1987.

encountering difficulties or in an uncertain position concerning liquidity or operations may have to address the issue when considering distributions or stock redemptions. Various factors and judgments will determine whether the equity-insolvency test has been met. These include the ability to generate funds from existing and contemplated demand for the corporation's goods or services which will satisfy existing and anticipated obligations as they come due. Another relevant consideration is whether a cash flow analysis of the corporation, considering the business forecast, the budget, and a sufficient time period, permits a conclusion that obligations will be paid as they mature. If the corporation has debt, the ability of the corporation to refinance the debt is important. Also, the general availability of credit to the corporation to enable it to continue normal business operations is a factor. Finally, to the extent the corporation may be subject to asserted or unasserted contingent liabilities, these must be estimated and considered in the evaluation. *See* 1 *Model Business Corporation Act Annotated* § 6.40, at 476–78 (3d ed. 1989). *See generally* Murphy, *Equity Insolvency and the New Model Business Corporation Act*, 15 U.Rich.L.Rev. 839 (1981) (various analysis used under equity insolvency test).

As of January 13, 1986, the following Omni assets were transferred. (1) $15,000 in cash was paid to Orion for overcharges on parts, which was refunded to Spears for his home improvements; (2) $18,691 in cash was paid to Riley for his 1985 accrued salary; (3) $25,000 in cash was paid to Jones to repurchase his stock; (4) $15,000 in property (Mercedes) was transferred to Riley to repurchase his stock; (5) $38,000 in accounts receivable was eliminated to repurchase Riley's stock; (6) $308,000 in accounts receivable was assigned to Jones and Riley to repurchase their stock. Omni's assets were reduced by over $110,000, not including the $308,000 Biomass receivable, prior to or as a result of the stock repurchase.

At the same time, by creating the notes payable to Jones and Riley, Omni's liabilities increased by $77,000. The notes were to be repaid beginning in March 1986. Riley never received any payments on his note. Jones may have received one or two payments on his note.

As of January 13, 1986, Omni's cash on hand and accounts receivable were not sufficient to enable Omni to conduct normal business operations for even a short period of time. Omni's cash balance of over $200,000 was quickly eliminated by payroll, overhead, and cash disbursements exceeding receipts by $264,000 over the next several months. Omni's receivables, which were overstated by the auditor, were not being timely paid. Omni's work in progress on major projects was 95% or more complete, and with no new significant projects, Omni was not generating new receivables to meet its obligations.

In the months which followed the January 13 transfers and as a result of Omni's poor financial condition, Omni was unable to obtain working capital loans and was unable to obtain construction bonds required on larger projects, virtually assuring Omni would be unable to generate the cash flows needed to pay creditors.

The court has determined Omni had trade accounts payable of nearly $500,000 as of January 31, 1986. Over $200,000 of these payables were not being paid by Omni.[6] In March, Omni was unable to pay the $10,834 Johnson Paving debt and the first installment on Riley's note. Omni could not pay its $28,164 income tax liability when due in April.

In summary, at the time Riley resold his stock to Omni and as a result of Omni's repurchase of the stock, Omni was insolvent in the sense that it was unable to pay its debts as they came due in the ordinary course of business. Alternatively, because Omni had a negative equity position follow-

---

6. Omni had three major creditors on the TVA Gallatin project whose debts were not being paid at the time Riley resold his stock. A.H. Mechanical, Global Power, and Allen Sherman Hoff were owed in excess of $200,000. Omni disputed the amounts owed on the debts at the time.

ing the January stock repurchase, Omni was left with unreasonably small capital to continue its business operations.

Next the court must determine whether Omni received a fair consideration for the repurchase of Riley's stock. In exchange for the cash, property, notes, and accounts receivable obtained by Jones and Riley for their stock, Omni received 400 shares of its own stock. The court has already determined that Omni had a negative net worth as a result of the stock repurchase. Omni's prospects of improving net worth and generating new revenues were minimal given Omni's poor financial condition and its inability to obtain bank loans, construction bonds, and new projects. In *Hyde Properties v. McCoy*, 507 F.2d 301, 307 (6th Cir.1974), the Sixth Circuit found the transfer by a corporation to its owner of two secured promissory notes in exchange for the corporation's own stock, received by the corporation when it had a negative net worth, to be fraudulent. The court commented on the fairness of the consideration as follows:

> At the time of the transfer, IHPT [the corporation] had a negative net worth.... As a result, the corporation's stock in the hands of McCoy [the owner] was virtually worthless. Any exchange of these shares for the well-secured Hyde Property notes would constitute a transfer without fair consideration.

*Id.* at 307 (applying Tennessee law). In this case, the property received by Omni was not the fair equivalent of the assets transferred to Jones and Riley.[7] Thus, the trustee has satisfied the elements of a fraudulent conveyance under §§ 66–3–305 and 66–3–306.

The trustee, pursuant to § 66–3–310, is entitled to have the stock repurchase set aside to the extent necessary to satisfy his claim against Riley. Tenn.Code Ann. § 66–3–310(1) (1982). Accordingly, the trustee is entitled to set aside the transfer of the Mercedes to Riley and is entitled to collect $15,000 for the value of the Mercedes at the time of the transfer.

■ Briefly, the court will address the trustee's alternate basis for setting aside the transfer of the Mercedes. The trustee also argues that the former Tennessee Business Corporation Act prohibited Omni's repurchase of its own stock at a time when Omni was insolvent. *See* Tenn. Code Ann. § 48–1–513(d) (1984) (repealed 1988). Section 48–1–513(d) prohibited a corporation from purchasing shares of its own stock when the corporation was insolvent or when the corporation was rendered insolvent by the purchase. *Id.* "Insolvency" was defined under the Act as the inability of the corporation to pay its debts as they came due in the usual course of business. *Id.* § 48–1–102(14) (repealed 1988). The "equity insolvency" analysis the court used for the fraudulent conveyance statute would also apply under the corporate statute. Thus, based upon the court's finding that Omni was "equity insolvent" at the time of or as a result of the stock repurchase from Jones and Riley, the stock repurchase would also have been a violation of § 48–1–513(d).[8] Accordingly, the trustee is also able to recover the value of the Mercedes from Riley based upon his directorship and his stock holdings in Omni at the time of the unlawful stock repurchase. *See* Tenn.Code Ann. § 48–1–720(a) (1984) (repealed 1988) (liability of shareholder for receiving unlawful payments); *id.* § 48–1–815(a)(2)(B) (1984) (repealed

---

**7.** While not directly ruling on the issue, the court also questions whether the "good faith" requirement found in § 66–3–304 was satisfied considering the secretive nature of the stock transaction and the misleading corporate minutes.

**8.** Riley asserts Omni had a surplus of assets over liabilities in excess of $200,000 at the time of the stock repurchase. From this surplus, Riley argues the repurchase of his stock was permitted under § 48–1–513(a). The court de-

termined, however, Omni had a surplus of $38,311 at the time of the stock repurchase. Of this amount, the evidence did not reveal what portion should be attributed to stated capital. Only if Omni had a capital or earned surplus above its stated capital requirement could Omni have repurchased its own stock, and then only to the extent of such capital or earned surplus and subject to the insolvency provision of § 48–1–513(d). *See* Tenn.Code Ann. §§ 48–1–102, –507, –513 (1984) (repealed 1988).

1988) (director liability for purchase of shares contrary to § 48–1–513).

### Claim No. 4

██ As briefly discussed above, Omni built and equipped an office and shop building on Riley's property in Riceville, Tennessee. Omni began work on the project around November 1985 and construction was basically completed in January 1986. Omni expended approximately $106,000 on this project. Omni was reimbursed $68,000 by Riley.

From its inception, Omni occupied office space owned by Jones in Cleveland, Tennessee. In August 1985, Omni decided to move its offices. Riley provided land he owned in Riceville, Tennessee, without cost to Omni, to locate the new shop and office. Although Omni constructed and equipped the new shop and office facility, title to the property and equipment remained in Riley's name. Riley testified his banker suggested the arrangement as preferable to the bank and simpler for Omni.[9] Riley acknowledged that as of January 13, 1986, he owed the $38,000 balance on the shop, but maintains Omni was not owed any profit. The remaining $38,000 balance was forgiven as part of Riley's stock repurchase arrangement with Omni.

Upon completion of the shop in January 1986, Omni occupied the premises and began paying rent on the space to Riley. By late May, Omni was having difficulty paying its rent. In October or November 1986, Omni moved out of the Riceville facility.

Pursuant to the Tennessee Fraudulent Conveyance Act and the former Tennessee Business Corporation Act, the trustee asserts the $38,000 credit Riley received as part of his stock repurchase was improper because Omni was insolvent at the time of or became insolvent as a result of the stock repurchase. The trustee also asserts self-dealing on the part of Riley prevented Omni from obtaining profits on the Riceville shop project.

With regard to the trustee's claim seeking the $38,000 credit Riley received as part of the January 13, 1986, stock repurchase, the trustee relies on the same statutes, causes of action, and proof as discussed by the court in trustee's claim no. 3 above. Based upon the findings that Omni was insolvent under both the "balance-sheet" and "equity-insolvency" tests, and upon the finding that Omni's receipt of its own shares of stock was not fair consideration for the transfer of assets to Riley, the court concludes the credit of $38,000 given to Riley on the Riceville shop account was a fraudulent conveyance under Tennessee Code Annotated §§ 66–3–305 and 66–3–306. The trustee may set aside the credit on the account and recover from Riley the $38,000 remaining balance.

The trustee's claim for lost profits on the Riceville shop project is discussed below at trustee's claim no. 7 in conjunction with trustee's claim for lost profits on the Power Management project.

### Claim No. 5

In late May or June 1986, Riley presented Omni with an invoice in the amount of $10,012.57 for rents due on the Riceville shop from March through May of 1986 and for several trucks Riley had rented to Omni. Omni was unable to pay the invoice in cash. Riley received as partial payment a 1985 Ford F–250 truck and credited Omni with $6,600 on the debt. The Ford truck had formerly been used by Spears, but was no longer needed after Spears resigned from Omni on May 23, 1986. The evidence indicates that the truck had a value of at least $6,600 at the time of the transfer to Riley.

The trustee asserts Riley's receipt of the 1985 F–250 Ford truck was a preference to an insider in violation of 11 U.S.C.A. § 547.[10]

---

**9.** Had Omni become the owner of the shop, Riley would have had to transfer the real estate to Omni, and a mortgage on the real estate would have had to have been released. Instead, Riley borrowed $75,000 for construction funds and gave a personal note to his bank.

**10.** Section 547(b) states as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

The defendants contend several elements of the trustee's claim are not satisfied. First, the defendants contend Omni was not insolvent at the time of the transfer. Second, defendants contend the trustee failed to prove Riley received more than he would have if no transfer had been made and the case had been treated as a chapter 7 liquidation.

The court has already determined Omni was insolvent under the balance-sheet test as of January 31, 1986. Omni's financial condition certainly did not improve by May 1986. McCullough's testimony regarding Omni's financial condition in May 1986 revealed Omni's position had worsened. Thus, the defendants' first contention fails.

■ Next, the defendants argue the trustee did not offer proof to show § 547(b)(5) was satisfied. The defendants correctly point out the trustee's oral testimony regarding payments to unsecured creditors concerned payments in the current chapter 7 case. According to the United States Court of Appeals for the Sixth Circuit, the § 547(b)(5) evaluation is to be made as of the time the debtor originally filed its bankruptcy petition. *See Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir.1986); *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques)*, 67 B.R. 899 (Bankr.E.D.Tenn.1986) (Kelley, J.), *modified*, 78 B.R. 162 (Bankr. E.D.Tenn.1987) (additional proof permitted). In this case, the value of the transfer received by Riley should be judged against a hypothetical liquidation at the time Omni filed its chapter 11 petition on May 22, 1987.

■ Although the trustee did not give oral testimony · concerning payments to unsecured creditors as of May 1987, the trustee did introduce the debtor's schedules filed with Omni's chapter 11 petition. These schedules list Omni's total assets at $740,133.08 and Omni's liabilities at $740,-681.65.[11] While these numbers alone might suggest a 100% distribution, a closer inspection reveals Omni's assets were severely overstated. Omni's schedules show liquidated debts owed to it of over $521,000. Included within this portion of assets is the $308,000 Biomass receivable Jones and Riley took as part of the January 13, 1986, stock repurchase. This receivable has never been collected. Also included was the Union Boiler receivable (valued at $154,792) which was not collected in that amount, but was settled for $36,000 plus interest. The elimination of these two receivables reduces Omni's scheduled assets by over $420,000 leaving a remaining asset balance of no more than $320,000.

On the liability side, Omni listed unsecured claims worth $633,978.99. At least $435,000 of unsecured claims remained when the case was converted to a chapter 7. The court finds sufficient evidence was introduced to show that unsecured creditors would have received less than 100 percent of their claims at the time Omni filed its chapter 11 petition in May 1987. *See American Bank v. Leasing Serv. Corp.*

---

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1979 & Supp.1989).

**11.** Schedule A filed with Omni's chapter 11 petition listed liabilities as follows:

| | |
|---|---:|
| Priority claims | $ 75,362.78 |
| Secured claims | 31,339.88 |
| General unsecured claims | 633,978.99 |
| Total Liabilities | $740,681.65 |

Schedule B listed Omni's assets as follows:

| | |
|---|---:|
| Tangible personal property | $ 90,625.00 |
| Liquidated debts owed Omni | 521,399.80 |
| Contingent/unliquidated debts owed Omni | 128,108.28 |
| Total Assets | $740,133.08 |

*(In re Air Conditioning, Inc.)*, 845 F.2d 293, 297 (11th Cir.1988); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 872 (D.Utah 1987). The court concludes the trustee has satisfied the § 547(b)(5) requirement.

As to the other elements of the trustee's preference claim, the court finds at the time Riley received the Ford truck, he was a director and the sole shareholder of Omni stock.[12] *See* 11 U.S.C.A. § 101(30)(B)(i) (West Supp.1989) (definition of insider). Also, the court concludes the transfer took place sometime after May 23, 1986. Thus, Riley received the transfer within one year of Omni's bankruptcy. Finally, Riley's receipt of the vehicle was on account of an antecedent debt as the truck was exchanged for Omni's prior rental of office space and several pieces of equipment. The trustee is entitled to recover $6,600 for the value of the vehicle transferred.

*Claim No. 6*

The trustee also seeks recovery of a preference from Riley for the transfer of Omni's 1979 International tractor. Shortly after Riley received the 1985 Ford pickup, Riley presented Omni with another bill for paving performed by Johnson Paving Company on the Power Management job.[13] Apparently, Power Management paid the bill and was seeking reimbursement from Omni. Omni could not pay the $10,834 bill in cash. Instead, Omni transferred a 1979 International tractor and a trailer to Riley and Bob Harris (co-owner of Power Management) to satisfy the debt. Riley testified that the value of the tractor and trailer was approximately $12,000 at the time of the transfer.

Consistent with the analysis under the trustee's claim no. 5, the court finds the transfer to Riley of the International trac-

tor was preferential and received by an insider within one year of Omni's bankruptcy. The trustee is entitled to recover $12,000 from Riley.

*Claim No. 7*

The trustee asserts Omni was wrongfully deprived of profits earned from Omni's construction of a steam plant for defendant Power Management. The trustee contends that Omni did not receive its profits because of conflicts and self-dealing created by Riley's ownership interest in both companies.

In late 1984 and early 1985, Riley and Bob Harris formed the defendant South Carolina corporation, Power Management. Riley owned 55% of the stock and held the office of president. Harris owned the remaining 45% of the stock.

Power Management was formed to build a steam plant in North Carolina. Steam from the plant was to be supplied to a company known as Baxter–Travenol, a manufacturer of medical supplies that used steam for sterilization.

In early 1985, Riley prepared a cost estimate for construction of the North Carolina plant. Riley's estimate to construct the plant using a used boiler was $1,560,000, which included $150,000 for profit and overhead.[14] Riley's estimate was the basis for the fixed-price contract entered into between Omni and Power Management on May 3, 1985. The contract was signed by Riley for Omni and by Harris for Power Management. Riley was a major stockholder and president of both companies at the time.

Concerning Riley's cost estimate on the Power Management project, prior to the time Riley formed Omni, he served as vice president and general manager of Perry

---

**12.** At the Omni board meeting on May 23, 1986, Riley, Spears, and McCullough agreed Omni would repurchase each person's shares of stock and that Spears and McCullough would resign from the board. Riley remained as a director and did not return his 50 shares of Omni stock until sometime in the fall of 1986.

**13.** The Johnson Paving debt is discussed more fully above in the court's discussion of Omni's insolvency.

**14.** Riley's $1,560,000 price estimate broke down as follows: $909,000 for parts; $95,000 for construction finance charges; $150,000 for two front-end loaders; $20,000 for spare parts; $10,000 for tools; $100,000 for land; $126,000 for labor; and $150,000 profit and overhead.

Smith Company for 5½ years. Perry Smith was a mechanical contracting firm that developed and constructed wood-fired boiler plants similar in type to the Omni–Power Management project. Riley testified his original bid of $1,560,000 was fair to Omni. In support of his contention, Riley compared Omni's estimate with an estimate submitted by Perry Smith on a similar project constructed for Power Management in 1987–88.[15] The comparable project, after adjustments, would have had a contract price of approximately $1,505,000 according to Riley.

Prior to entering the contract with Power Management, Riley reviewed the job cost and expected profits with Jones. At that point, Jones was pleased with the profit figure incorporated into the contract price. Riley testified that within the $1,560,000 figure, $95,000 for construction finance charges were improperly included in the original estimate as part of Omni's cost. A change order eliminating the finance charges and crediting Omni for 29,000 it paid in closing costs on the project reduced the total contract to just below $1,500,000. The change order did not affect Omni's expected profit, which would have approximated 10% of the revised contract price and 11% based upon Omni's cost.

The only evidence submitted by the trustee concerning Riley's cost estimate on the Power Management project was McCullough's testimony that a fair profit on a fixed-price contract such as the Power Management project would be at least 15%.

By July 1985, Omni began work on the Power Management job. On two different occasions, Riley had to replace the job superintendent. By September, Riley began spending considerable time in North Carolina and by Thanksgiving he was acting as job superintendent. Riley had never functioned in that capacity before and the Power Management job consumed a majority, if not all, of Riley's attention during late 1985.

In order for Power Management to receive certain tax credits, the steam plant had to be substantially completed by the end of 1985. Omni's contract specified December 31, 1985, as the date for substantial completion. To achieve these deadlines, Omni's workers had to work overtime and weekends from Thanksgiving until year's end. Because of cost overruns, Riley knew by September or October that Omni could not perform its contract for the agreed price.

Riley informed Harris that Omni could not perform the contract for $1,560,000. Riley and Harris agreed that Power Management would pay for the costs Omni incurred over the contract price. Riley testified, however, that profits Omni originally anticipated receiving could not be paid as a result of Omni's failure to perform as agreed.[16]

After a number of change orders to the contract, Power Management paid Omni $1,901,000 on the project. Gena Cavett testified that Omni's costs on the Power Management job were $1,763,000. Cavett's testimony suggests Omni made a profit of approximately $130,000 on the job.

The trustee disputes the cost figures supplied by Cavett. Cavett's computation for costs on the Omni job were basically taken from the draw requests submitted by Omni to First American National Bank during the construction of the steam plant. The draw requests used by Cavett track the costs shown by Omni in its cash disbursement ledger. The cash disbursement ledger listed each cash payment made by Omni for a particular month and assigned the cost to a particular job on which the cost was incurred. In theory, one could arrive at a total cost figure on the Power Management project by simply totalling each month's disbursements listed under

15. The Omni project consisted of building a 120,000 pound wood-fired boiler for approximately $1,500,000. The Perry Smith project consisted of building a 110,000 pound wood-fired boiler with similar pressure and operating divisions as well as an 80,000 pound oil-fired boiler for a total of $1,430,000.

16. There was a 4% profit figure built into labor costs, and Riley and Harris understood this built-in profit on labor would be paid notwithstanding the general agreement to eliminate Omni's profits.

the Power Management job number. To this figure would have to be added any wire transfers as they were not reflected in the cash disbursement ledger.

The problem with determining Omni's job costs for a particular project using the cash disbursement ledger was that many expenses that were paid by Omni were not assigned to the correct job numbers. The trustee provided several examples of mischarges in the cash disbursement ledger, which included: Richard Spears mischarged over $45,000 worth of labor and materials used for construction on his home to a project Omni was working on for Boiler & Heat Exchange (Queen Carpet); at least $21,761 expended on Riley's Riceville's shop building in December 1985 were charged to the Florida Biomass project; between September and December 1985, Omni paid nearly $23,000 to Jones & Riley Rentals and charged the Florida Biomass project at a time when no rental equipment was being used on that project; from September 1985 through January 1986, approximately $141,000 worth of Omni expenses were mischarged to the Florida Biomass project. The mischarges listed above occurred at the time that Omni was working on the Power Management project.

Cavett testified that if an invoice associated with the Power Management job had been mischarged and assigned to another job, then the mischarged item would not have been reflected in Cavett's total figure of Omni's cost on the Power Management job. The responsibility for assigning invoices to be paid by Omni to a particular job was that of Riley and Spears. After the invoice was assigned to a particular job number, then Cavett would simply write a check for the appropriate amount and note in the disbursement ledger which job the cost was assigned to. It appears that Cavett was unaware at the time that certain invoices were being charged to the wrong job numbers.

As a result of the unreliability of Omni's accounting books and as a result of unaccounted for mischarges during the time of the Power Management contract, the trustee asserts that the total cost figure presented by Cavett is an unreliable accounting of Omni's costs. Moreover, Riley testified that his intentions were to only pay Omni for its actual cost once it was determined that Omni could not complete the Power Management contract for the agreed price.

Several exhibits were presented at trial that Riley had prepared showing estimates of Omni's cost on the Power Management project. In a February 1989 deposition, Riley testified that Omni's profit on the Power Management project was about $30,000. At the time of Riley's deposition in February, the trustee had not brought an action against Riley to recover lost profits on the Power Management job. After this action was filed, Riley prepared another estimate of Omni's costs in August 1989 and determined that Omni's profits on the Power Management project were approximately the same as the figure presented by Cavett. The trustee objects to Riley's August estimate in that it was prepared in the same manner as Cavett's estimate using the inaccurate Omni accounting records. Included within Riley's August cost estimate is a statement which concerns change orders on the project. It reads:

> There were nine (9) change orders which added $263,776.77 to the contract. Power Management, Inc., also paid an additional $98,415.50 without change orders *to prevent Omni from losing money on the contract* (emphasis added).

Later in the same estimate, Riley stated, "When the project started to overrun, as any 'hard money' contract the profit was lost, but Bob Harris and I agreed to pay all Omni Expenses so that Omni would not lose money on the contract." Riley explained that his revised cost estimate, and Omni's increased profit, were the result of an invoice error submitted in one of the draw requests to First American National Bank in the amount of $100,000. Riley states, "Omni cost was overstated $100,000 by an error in addition." Cavett testified that Riley told her during construction of the project to increase the job cost by $100,000 in the draw request so that more money could be drawn to cover the payrolls that were being incurred. Cavett testified

that this was common practice on construction projects and that the bank knew that the overcharge was being made.

The trustee asserts Riley, if anyone, knew what Omni's cost on the Power Management project was and he would have only paid Omni enough to cover that cost. The trustee seeks at least $190,000 for lost profits.

Much of the trustee's proof relating to the Power Management project was introduced to show that Omni did not receive its anticipated profit on that project. Moreover, the trustee revealed accounting and bookkeeping irregularities which prevented anyone from knowing exactly what Omni's costs or profits really were on the project. However, before considering whether Omni did or did not make a profit on the project, the court must evaluate the transaction as of the time it was entered into between Omni and Power Management.

Under the Tennessee Corporation Act applicable at the time of the Power Management transaction, corporate transactions in which directors or officers had personal or adverse interests were examined under the following standard:

(a) Except as otherwise provided in § 48–1–409 and § 48–1–814, no transaction in which a director or officer has personal or adverse interest shall be void or voidable solely for this reason or solely because he is present at or participates in the meeting or his vote is counted if:

(1) The material facts as to his interest and as to the transaction are disclosed or are known to the board or committee and the fact of such interest is noted in the minutes, and the board or committee authorizes, approves or ratifies the transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or if

(2) The material facts as to his interest and as to the transaction are disclosed or are known to the shareholders or members and the transaction is specifically approved by vote of the shareholders or members without counting the votes of any shares owned or controlled by the interested director or officer or the vote of the interested director or officer if he is a member; or if

(3) The transaction is fair and equitable as to the corporation at the time it is authorized or approved, and the party asserting the fairness of the transaction establishes fairness.

Tenn.Code Ann. § 48–1–816(a) (1984) (repealed 1988).

■■■ Section 48–1–816 permits transactions between corporations with common directors or officers where there has been disclosure of material facts and approval based upon disclosure or if the transaction was fair and equitable to the corporation at the time it was entered. The record in this case does not indicate formal compliance with either subsection (a)(1) or (a)(2). No corporate minutes were introduced reflecting the required disclosure of Riley's interest in both Omni and Power Management and the approval, authorization, or ratification by the required vote of uninterested directors. *See id.* § 48–1–816(a)(1). No evidence was submitted showing a vote of the uninterested shareholders in the required numbers after disclosure of Riley's interest was made to them.[17] *See id.* § 48–1–816(a)(2). The court will, therefore, examine the Power Management contract in light of subsection (a)(3), i.e., whether the transaction was fair and equitable to Omni at the time it was entered into. The burden of proof in demonstrating fairness rests with the defendants.

Only two cases in Tennessee have applied the fairness test of § 48–1–816(a)(3). In *Tennessee Dressed Beef Co. v. Hall,* 519 S.W.2d 805 (Tenn.Ct.App.1974), minority shareholders of Tennessee Dressed Beef Company, a closely-held meat processing corporation, sued the defendants who were officers, directors, and majority shareholders of the company. The defendants

---

**17.** The court notes that Riley, Spears, and Jones were the only directors, officers, and shareholders at the relevant time. Although no formal approval was obtained in accordance with § 48–1–816, Jones and Spears were certainly aware of the Power Management contract and Riley's interest in both contracting parties.

formed their own trucking company to transport the beef from the meat processing company. The defendants caused the trucking company and the meat processing company to enter into a contract for transportation services. The Tennessee Court of Appeals upheld the chancellor's finding that the contract was fair since the terms were comparable to and prices lower than those offered by independent transportation companies. *Id.* at 807–08.

In *Old Folks Mission Center v. McTizic*, 631 S.W.2d 433 (Tenn.Ct.App.1981), the Tennessee Court of Appeals applied § 48–1–816(a)(3) to a transaction where the board of directors of a retirement home executed promissory notes and deeds of trust to several members of the board for services rendered to the home. Finding the disclosure provisions of subsections (a)(1) and (2) were not satisfied, the court evaluated the fairness of the transaction. The court found the defendant asserting the fairness of the transaction had participated in active fraud in procuring the notes and deeds of trust and was thus prohibited from proving fairness. *Id.* at 436.

A survey of cases evaluating the fairness of transactions where interested-director questions have arisen suggests the following factors may be relevant in evaluating a specific transaction: (1) circumstances of the transaction indicate an arms-length bargain; (2) adequate consideration has been given; (3) the needs of the corporation have been considered; (4) good-faith conduct on the part of the interested parties; and (5) a legitimate business purpose has been served. *See* Comment, *Corporate Director Conflicts of Interest: The Fairness Test and Its Application under Existing Statutory Provisions and Proposals for Statutory Reform*, 53 Tenn.L.Rev. 799, 817–27 (1986) (citations omitted).

 The court finds nothing in the evidence to suggest that at the time Omni entered into its contract with Power Management, Riley acted improperly or that Omni was treated unfairly. Riley's construction cost estimate was consistent with similar projects constructed for Power Management by Perry Smith Company.

Omni stood to make profits of nearly $150,000 on a contract of $1,500,000. The trustee contends Omni should have made at least 15 percent profit on such a contract, and while 15 percent would be more desirable than a 10 percent profit, the court cannot say Omni's expected profit on the contract was unfair. The fact that Omni later was unable to perform its contract as agreed and did not make the anticipated profits did not render Omni's contract unfair at the time it was entered into. Omni had a fixed-price contract, Omni incurred significant cost overruns, and Omni's profits were lost due to its inability to perform its obligations.

The evidence does not suggest the cost overruns incurred by Omni during the performance of the Power Management contract were particularly within the control of Riley. Twice Omni had to replace site superintendents because equipment was disappearing or crews were not being allocated properly and efficiently. Early inefficiencies and manpower allocations, at least in part, contributed to increased manpower demands in late 1985, which increased Omni's labor expense and overtime.

The trustee does not contend Omni lost money due to the contract. Under normal circumstances, had Omni been unable to perform its contract as agreed, any added expenses incurred (as in the TVA Gallatin project with Union Boiler) would have been absorbed by Omni. Riley prevented Omni from having to pay the additional $350,000 to $400,000 expended on the project.

From another prospective, the Power Management project was one that provided significant cash flows into Omni for more than six months. The project enabled Omni to keep the crew of 30 to 35 laborers employed during the term of the project. Overhead and equipment costs were paid while the project was ongoing. These factors, while not directly weighing on the fairness of the transaction to Omni, do merit some consideration since no evidence was presented concerning other projects which Omni would have performed in lieu of the Power Management project. In fact, after the Power Management project,

Omni did not obtain another job in excess of $100,000. Accordingly, the trustee shall not prevail on its claim for lost profits on the Power Management project.

The trustee also seeks lost profits on the Riceville shop building Omni constructed on Riley's property. While the transaction is somewhat confusing, it appears Riley used his land and was to pay for the cost of the shop and equipment necessary to stock the shop. Riley then leased the shop back to Omni and received monthly lease payments. As of January 13, 1986, Riley still owed a balance of approximately $38,000 on the shop building.

The trustee asserts Riley's self-dealing prevented Omni from receiving any profit and was unfair. The court will again look at the fairness of the transaction from Omni's perspective.

The Riceville shop transaction can be analyzed in several ways. First, assume Omni was given title to the shop and equipment. Omni would have had a cash outlay of $106,000 for buildings and equipment. Omni further would have had to purchase land, either Riley's or elsewhere, upon which to construct the facility. This was at a time when Omni's financial position was precarious at best.

Apparently, a business decision was made whereby Riley would donate his land and receive title to the shop and equipment. Although Omni made the initial outlay of cash for the buildings and equipment, Riley was to reimburse Omni for the $106,000 necessary to construct the facility. Omni did not have to make a substantial capital investment, but instead only had to pay monthly rentals on the facility. While there was some evidence presented as to Omni's monthly rental payments,[18] the court was not provided with any method of evaluating the figure as being high or low.

Ordinarily, if Omni was constructing a building or a plant for a third party, Omni would be entitled to receive a profit for its work. In this instance, although Omni was doing work for Riley, Omni was doing the work for itself as well. Omni was directly benefitted by providing itself a shop and an office facility. The court is not persuaded that Omni should automatically have received profits on a project in which it had an interest and from which it received benefits. The trustee is not entitled to profits on the Riceville shop project.

*Claim No. 8*

The trustee's final claim seeks recovery of salary withdrawals made by Riley in January 1985 and 1986. On January 8, 1985, Riley withdrew $20,212.91 for accrued salary in 1984. On January 8, 1986, Riley again made a withdrawal for 1985 accrued salary of $18,691.14. The trustee argues Riley's salary was never fixed or authorized by Omni's board of directors and that the breaches by Riley of his fiduciary duty to Omni warrants a return of the salary withdrawals.

There are no Omni corporate minutes reflecting action by Omni's board of directors in setting Riley's salary, nor do minutes reflect authorization by the board for Riley, as president of Omni, to establish officer's salaries. Riley testified and the court finds it was understood between Spears, Jones, and himself that Riley's salary was to be $50,000 per year. Such a salary does not appear to be unreasonable as payment to Riley in his capacity as president and principal officer of Omni. *See Watts v. Gordon,* 127 Tenn. 96, 153 S.W. 483 (1912); *Nashville Breeko Block & Tile Co. v. Hopton,* 29 Tenn.App. 394, 196 S.W.2d 1010 (1946); *Graves v. A. Graves Co.,* 7 Tenn.App. 369 (1928). The court concludes the trustee is not entitled to recover the salary withdrawals made by Riley due to a lack of corporate formality.

The trustee's principal contention in seeking recovery of Riley's salary withdrawals is that while Riley was the president and chairman of the board of Omni, he engaged in numerous transactions which breached the fiduciary duty he owed to

---

**18.** McCullough testified Omni was originally to pay $2100–2300 per month rent. Because of financial difficulties, Omni's rent was reduced. Exhibit 39, the invoice Riley presented to McCullough for past-due rent, showed a monthly rental of $1659.19 for March through May of 1986.

Omni. This claim for recovery of Riley's salary is based upon equitable principles and is dependent upon the specific facts in each case.

■ The general rule stated by many courts is that corporate officers who breach their their duty of loyalty or who willfully breach their contract of employment are not entitled to any compensation for services performed during that time period even though some services were performed properly. *See, e.g., Wilshire Oil Co. v. Riffe*, 406 F.2d 1061, 1062 (10th Cir.1969); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211 (1976); *see also Chelsea Indus. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320 (1983); *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344 (1948); 5A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2145, at 163–64 (rev. perm. ed. 1987); Restatement (Second) of Agency § 469 & comment e (1958).

The relevant time periods for which the trustee seeks recovery of Riley's salary are from May 1984 through December 1984 in which Riley accrued $20,212.91 in salary and for which Riley made a withdrawal on January 8, 1985, and the period from January 1985 through December 1985 in which Riley accrued $18,691.14 in salary and for which he made a withdrawal on January 8, 1986. Acts by Riley subsequent to December 1985 would not be relevant in determining whether Riley's 1985 salary is recoverable.

With regard to Riley's withdrawal of 1984 accrued salary, the court concludes the trustee has not offered sufficient proof to require the return of any portion of that salary. With regard to Riley's withdrawal of 1985 accrued salary, the question is a much closer one. However, bearing in mind the return of an officer's salary is an equitable remedy depending upon the specific facts in each case, and further considering that other courts confronted with the issue have generally dealt with wrongful conduct of officers which evidenced a breach of the officer's fiduciary duty over a continuing period of time and which was more egregious and potentially harmful than the conduct at issue here, the court concludes the forfeiture of Riley's 1985 accrued salary is not warranted in this case.

The court will enter an order in accordance with this memorandum.