**In re ARROWHEAD GARDENS, INC., Debtor.**

**Anne FOLEY, Trustee, Plaintiff,**

v.

**Richard J. BRIDEN, Defendant.**

**Bankruptcy No. 79–1970–JG. Adv. No. 81–0390.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 12, 1983.

---

Anne Foley, Arlington, Va., Trustee.

Gary Cruickshank, Riemer & Braunstein, Boston, Mass., for plaintiff.

Harold Jacobi, III, Clune & Jacobi, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

In this adversary proceeding the Trustee seeks to recover $57,637.35 from the defend-

ant as preferential transfers voidable under 11 U.S.C. Section 547 or in the alternative seeks to recover this amount as damages for his breach of fiduciary duty to creditors of the estate. The defendant's Answer denied all material allegations, and raised as affirmative defenses that the company was solvent when the transfers were made, and that in managing the business he exercised good business judgment not in breach of fiduciary obligations to creditors.

An involuntary petition was filed against the debtor on October 29, 1979, the Trustee was appointed on November 15, 1979, and an Order For Relief was entered on January 22, 1980. This adversary proceeding was filed by the Plaintiff on May 21, 1981. The parties submitted an agreed statement of facts, and a trial was held on June 21, 1982 and September 28, 1982. Based upon the pleadings, agreed statement, testimony and documentary evidence I find the following facts as required by Bankruptcy Rule 7052.

The defendant Richard J. Briden, was the President, Treasurer, Director, sole-shareholder and person in control of the debtor corporation until August 1979. Prior to April 2, 1979 the debtor operated a retail nursery business in Wayland, Massachusetts and a wholesale nursery business in Beverly, Massachusetts. On April 2, 1979 the debtor sold all assets of the Wayland location to an unrelated buyer—Arrowhead Nurseries, Inc. for $225,000, because Briden had decided to eliminate the retail aspect and concentrate in wholesale marketing. The proceeds of the sale were disbursed as follows: $110,000 was paid to Shawmut Community Bank, $6241 was paid to Natick Trust Company, $14,000 was paid to Laura Briden, $59,359 was paid to satisfy trade creditors, forty-five thousand was paid to Briden on April 13, 1979 to partially repay a loan of $112,968 he made to the company in February 1978. This loan was not evidenced by a note, no interest was provided for, and no time for payment was specified. From February to April 1979 Briden received from the debtor $12,637.35 in repayment of the antecedent debt owed to him by Arrowhead.

The debtor's unaudited balance sheet and financial statement dated August 31, 1978 (Plaintiff's Exhibit 3) prepared by Malcolm M. Beers, Inc. on December 26, 1978 shows assets of $490,520 and liabilities (other than stockholders' equity) of $448,312. The 1978 balance sheet contains entries for cash, accounts receivable (discounted by 3% for bad debt) inventory, prepaid expenses, leasehold improvements, machinery, equipment, furniture, vehicles, depreciation, cash surrender value of life insurance and relocation costs.

The liability side of the 1978 balance sheet lists the following categories of debt—notes payable, accounts payable, customer deposits, taxes, accrued liabilities (payroll & rent), long-term debt due within one year, long term debt, deferred taxes, debt to stockholder, in addition to stockholders' equity. Neither party submitted into evidence any actual profit and loss figures for the period from August 1978 to April 1979. It is known, from the testimony of the debtor's comptroller, Mr. Ayotte, that although the company had projected favorable sales in the spring of 1979, the projections were not realized, and that between April and August 1979 the business collapsed due to lack of sales. Mr. Briden also testified that in April 1979 the business was not operating successfully and that in July 1979 the company could no longer pay its bills as they became due. Sales in May 1979 were $67,000, in June 1979 $13,000, in July 1979 $4500, and in August 1979 $8197.

Plaintiff's Exhibit 4 is debtor's balance sheet for the period ending April 30, 1979. It was prepared by Briden in July of 1981, and revised in June 1982, in preparation for a deposition in this adversary proceeding. This balance sheet shows assets totalling $284,349.31 and liabilities (not including stockholder's equity) of $245,417.45.

The asset side of the balance sheet lists the value of accounts receivable as $21,259.72 but does not contain the 3% discount factor for bad debt as contained on previous balance sheets. Inventory is valued at $182,061.27 which is also the inventory fig-

ure stated on the March, May, June and July 1979 balance sheets. The inventory value as listed on the April 30, 1979 statement was not based on an actual physical inventory but was a figure derived from the August 1978 inventory plus the costs of growing the products, labor, and overhead, minus the estimated costs of items sold during the period from August 1978 through April 1979. Also listed as an asset on the balance sheet is an $8251.50 item for "relocation costs deferred", which according to a note to the August 1978 balance sheet is the value of leasehold improvements abandoned at the Wayland location amortized over the term of the Beverly lease. The liability side of this balance sheet omits entries which were included on the 1978 balance sheet: rent, (approximately $2000 on the 1978 statement) and customer deposits (approximately $5000 on the 1978 balance sheet). There was no evidence presented as to why these items were omitted from the 1979 balance sheet.

The debtor's August 31, 1979 balance sheet (Plaintiff's Exhibit 5), shows a negative net worth of $87,042.46, assets being valued at $113,673.47 and liabilities of $200,-715.93.

It is undisputed that Briden, an insider within the meaning of 11 U.S.C. Section 101(25) and a creditor of the estate, received $57,637.35 from the debtor on account of antecedent indebtedness within the year prior to filing the petition, and that this is more than he would receive as a distribution in a Chapter 7 case.

The parties agree that the only issues presented are: whether the debtor was insolvent at the time of the transfers and whether Briden had reasonable cause to believe that the debtor was insolvent at the time of the transfers.

### INSOLVENCY

Insolvency is defined in 11 U.S.C. Section 101(26) as an entity's "financial condition such that a sum of such entity's debts is greater than all of such entity's properties, at a fair valuation . . . .". Thus, under the Bankruptcy Code, insolvency is deter-

mined by the traditional balance sheet test. *Matter of Bishop,* 17 B.R. 180 (Bkrtcy.N.D. Ga.1982). The concept of fair valuation is not synonymous with liquidation value; fair valuation has been interpreted to mean the amount which can be realized from the assets within a reasonable time. *American National Bank And Trust Company of Chicago, v. Bone,* 333 F.2d 984 (8th Cir.1964). "Unless a business is on its deathbed . . . . the 'fair value' of assets within the meaning and purview of Section 547(a) of the Bankruptcy Code, is the going concern value or fair market price." *In re: Utility Stationary Stores, Inc.,* 12 B.R. 170, 171, 176 (Bkrtcy.N.D.Ill.1981). The Application of the balance sheet test does not focus on the liquid funds available at the time of the transfer. *In re: Randall Construction, Inc.,* 20 B.R. 179 (D.C.D.Ohio 1981). For the purposes of determining fair valuation, it may be appropriate to reduce or eliminate the value of assets which can be made available for payment of debts within a reasonable time. Thus, inventory is not valued at cost or book value, but its value is based on its age, liquidity, and the conditions in the trade. *L. King, 2 Collier on Bankruptcy,* Par. 101.26, at 101–59 (15th ed. Supp.1982).

The value of accounts receivable must be discounted for uncollectable and disputed debts. *L., King, 1 Collier on Bankruptcy* Par. 101.26 at 101–58 (15th ed. Supp. 1982). In addition, an asset entry on a balance sheet may not necessarily be an asset for the purpose of determining insolvency even though it may be an appropriate entry in accounting terms. *See, e.g., In re: Fulghum Construction Company,* 7 B.R. 629 (Bkrtcy.M.D.Tenn.1980) (debtor's equity in jobs" is not an asset to be considered in determining insolvency because it is not something for which a purchaser would be willing to pay.)

The debtor's balance sheet for the period ending April 30, 1979, which was prepared in June 1981, presents a picture of solvency. I am satisfied however that this is not an accurate portrayal of the debtor's financial condition in April 1979.

The balance sheet contains several erroneous asset valuations. The balance sheet lists accounts receivable as $21,259. Although the August 1978 balance sheet decreases the value of accounts receivable by 3% for bad debt and although there is evidence that $1600 in accounts receivable were not collected as of August 31, 1979, the balance sheet does not discount the value of the receivables. I find that the value of receivables should be reduced by $1600. The April 1979 balance sheet overstates the value of inventory at $182,000. This figure was not based on a physical count of inventory, but is an artificial figure obtained by subtracting the amount of sales from the August 1978 inventory and adding to this figure the amount of purchases for the period from August 1978 through April 1979. The figure is suspect for three reasons. First, all of the debtor's financial records for March through July 1979 give the same figure for the value of inventory; that inventory value should remain constant for five months seems hardly believable. Secondly, Mr. Briden admitted that in 1979 much of the wholesale inventory had been on the premises since November 1978. Finally, the value of the debtor's inventory in August 1979 was only $40,000 which leads one to conclude that the $182,000 figure is inflated. Plaintiff's expert testified that a more accurate arithmetical estimate of inventory value as of April 1979 is $90,000 because there is an unexplained decrease in inventory of $92,000 from August 1978 to August 1979. He explained this could be caused by one of three reasons: discarding inventory, sales at less than usual prices, or over valuation of inventory in the August 1978 balance sheet. The first reason can be eliminated because Briden testified that this amount of inventory was not discarded as spoilage. Briden attempted to explain that the decrease was due to the difference between costs and sales price. There was no indication in the debtor's records of unusually low sales prices, or of distressed sales during this period, according to Plaintiff's accountant. I find that the debtor has failed to satisfactorily explain this decrease in inventory, and that the figure of $182,000 was overstated by $92,000.

Another flaw in the asset side of April 1979 balance sheet is the inclusion of the $8,251 item "relocation costs deferred". This item, explained in the August 1978 balance sheet is the capitalization of relocation costs and leasehold improvements abandoned at Wayland. This is not asset for balance sheet purposes because it is not the type of capital a buyer would pay for in a purchase of the business.

In view of these inappropriate balance sheet entries, the asset side of the April 1979 balance sheet must be reduced by $101,851. The accurate asset figure is $182,998, which is less than liabilities according to the same balance sheet.

I am also convinced that the April 1979 balance sheet omits certain liabilities. The April 1979 balance sheet contains no entries for customer deposit which according to the August 1978 balance sheet amounted to $5600. Omitted from expenses is an entry for rent, which was $2173 according to the 1978 balance sheet. Most importantly, the 1979 balance sheet fails to include the company's $19,573 liability for loans payable to insurance companies, secured by cash surrender value of life insurance, which had been listed on the 1978 balance sheet. There was no evidence presented that this liability had been satisfied as of April 1979. Thus, the liability side of the April 1979 balance sheet must be increased by $27,346.

The revised April 30, 1979 asset figure being $182,998, and the revised liability figure being $272,853 the Court is satisfied that the debtors liabilities exceeded its assets as of April 30, 1979, and thus the debtor was insolvent on this date.

## RETROJECTION

The transfers to Briden took place during April and March 1979; the substantial portions of the transfers were made in mid-April. Mr. Briden testified that there was no significant change in the asset/liability structure of Arrowhead from the beginning of April 1979 to April 30, 1979

the date of the available balance sheet. Where a debtor is shown to be insolvent at a date later than the date of the questioned transfer, and it is shown that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at the later date. *Hassan v. Middlesex County National Bank,* 333 F.2d 838 (1st Cir.1964); *Braunstein v. Massachusetts Bank & Trust Company,* 443 F.2d 1281 (1st Cir.1971). This method of determining insolvency, termed "retrojection", is frequently employed in bankruptcy cases where a debtor's financial condition as of the relevant date is unascertainable. *See Seligson v. N.Y. Produce Exchange,* 394 F.Supp. 125 (S.D.N.Y.1975); *In re: Lucasa Int'l Ltd.,* 13 B.R. 596 (Bkrtcy.S.D.N.Y.1981).

In the present case, Briden admitted that the circumstances surrounding the debtor's financial condition did not change from the beginning to the end of April. The debtor did not submit a balance sheet for any period in March to show that the debtor's financial condition was different from April 1979. Employing the retrojection method I find that it is appropriate to retroject the April 4, 1979 insolvency back to the dates payments were made to Briden in March and April 1979.

## REASONABLE CAUSE TO BELIEVE THE DEBTOR WAS INSOLVENT

The next issue presented is whether Briden had reasonable cause to believe the debtor was insolvent during March and April 1979, which the Trustee must prove by a preponderance of the evidence. *Kenneally v. First National Bank,* 400 F.2d 838 (8th Cir.1969).

The Code does not require actual knowledge of insolvency, but on the other hand, mere suspicion of insolvency is not enough to charge a creditor with reasonable cause to believe the debtor is insolvent. *In re: Gruber Bottling Works, Inc.,* 16 B.R. 348 (Bkrtcy.E.D.Penn.1982). Even though a creditor does not have knowledge of insolvency, if a creditor knows facts that would compel a reasonable person to inquire and

he fails to do so, he is charged with knowledge of facts an inquiry would reveal. *L. King, 4 Collier on Bankruptcy,* Par. 547.30, at 547–112 (15th ed. Supp.1982). Generally the courts look to a variety of factors to impute knowledge of insolvency: information contained in publications, undercapitalization, overdrafts, and bad checks, and operating losses. *In re: Fulghum Construction Company,* 7 B.R. 629 (Bkrtcy.N.D.Tenn. 1980). Where the recipient of the alleged preferential payment is the controlling officer of the debtor, it is not difficult to conclude that he had reasonable cause to believe the debtor was insolvent. Id. at 639.

This Court is reluctant to find that Briden lacked actual knowledge of Arrowhead's insolvency in the spring of 1979. He actively managed and oversaw all debtor's financial transactions during the relevant period. He compiled all financial records and kept all bank statements. Although his sales projections for 1979 were optimistically high, first half of 1979 sales failed to meet projections. Moreover, Briden is charged with knowledge of the true value of the inventory, not the value as stated in the April 1979 balance sheet, prepared in 1981. Briden conceded that after the sale of the Wayland operation on April 2, 1979, he did not take inventory or revise the corporate balance sheet. Due diligence would seem to require these measures where a major aspect of a business is being liquidated. If he had taken inventory or revised the balance sheet after the sale, Briden would have discovered that the company's liabilities exceeded its assets.

Accordingly, it is my conclusion that the payments made to Briden were preferential transfers recoverable by the Trustee under Section 547(a), and judgment shall enter for the Plaintiff in this adversary proceeding. In view of this conclusion on Count I, it is unnecessary to reach the merits of Count II of the Plaintiff's complaint which seeks damages for Defendant's breach of fiduciary duty to creditors.