**In re COATED SALES, INC., et al., Debtors.**

**COATED SALES, INC., Plaintiff,**

v.

**FIRST EASTERN BANK, N.A., Defendant.**

**COATED SALES, INC., Plaintiff,**

v.

**Ernest GLANTZ, Defendant.**

**Bankruptcy Nos. 88–B–11331 (CB) through 88–B–11336 (CB). Adv. Nos. 88–5915A, 89–6038A.**

United States Bankruptcy Court, S.D. New York.

Sept. 16, 1992.

Kaye, Scholer, Fierman, Hays & Handler, New York City by Lester Kirshenbaum, Joseph Pash, for Coated Sales, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Robert Smith, Karen Breslow, for First Eastern Bank, N.A.

Hellring, Lindeman, Goldstein & Siegel, Newark, N.J. by Rachel Davidson, for Ernest Glantz.

## DETERMINATION OF DEBTOR'S SOLVENCY UNDER § 547(b)(3) OF THE BANKRUPTCY CODE

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

### BACKGROUND

The debtor, Coated Sales, Inc. ("CSI," "Debtor" or "Plaintiff"), a specialty textile converting company, was formed in 1974 by Michael Weinstein, Ernest Glantz and Richard Bober. Over the course of five years starting in or about 1983, these three officers concocted a massive fraud involving fictitious invoice billings, false accounts receivable, false customer audit confirmations and nonexisting inventory records. The fraud was uncovered on May 23, 1988, contemporaneous with the announcement that CSI's auditors Peat, Marwick, Main & Co. ("Peat Marwick"), were resigning after being unable to confirm the existence of a $6,000,000 deposit on equipment that was booked as an asset. The funds earmarked for the deposit were illegally transferred to an account outside CSI's accounting control and eventually used to credit false invoices. Thereafter, upon the announcement of the resignation of CSI's officers and the disclosure of the material accounting irregularities, CSI's suppliers discontinued shipments and several banks attempted to seize funds, creating a state of chaos.

On June 16, 1988, CSI filed for chapter 11 protection in an attempt to quell the disorder. CSI struggled to stay in existence. However, investigation by Coopers & Lybrand ("C & L"), CSI's new auditors, revealed illegal funds transfers, which ultimately led to the criminal convictions of its officers.[1] Thereafter, many of CSI's subsidiaries were discontinued and its assets sold.[2]

Legal action for securities violations was subsequently filed by CSI's shareholders

---

[1] Seven officers of CSI, CSI's counsel, and two principals of non-debtor companies that participated in the fraud were indicted on charges including bank fraud, securities fraud, racketeering and money laundering.

[2] After a concerted effort, substantially all operating assets of CSI, including the plant, property and equipment of Kenyon Industries, Inc. ("Kenyon") and Cal–Pen Textiles, Inc., ("Cal–Pen") were purchased by the Hallwood Group Incorporated ("Hallwood") in March 1989 for $26 million.

based on §§ 10(b), 20(a) and 10(b)(5) of the Securities Exchange Act of 1934, as well as common law negligent misrepresentation.[3] In addition, there exists the potential for governmental action regarding CSI's liability for environmental violations at Kenyon Industries', a CSI subsidiary, landfill and factory site.

On April 12, 1988, prior to the discovery of the fraud, CSI borrowed funds under a $52,000,000 loan package from BancBoston Financial Company. The funds were used to repay existing loan obligations totalling $36,440,885 to four other banks, and to further finance CSI's operations. However, after the filing of the bankruptcy, CSI, exercising its duties as a debtor-in-possession, commenced actions to recover the funds that were used to pay the four banks as voidable preferences pursuant to § 547 of the Bankruptcy Code (the "Code"). Three of the banks settled with CSI, but First Eastern Bank, N.A. ("First Eastern" or "Defendant") did not.

CSI seeks to avoid the April 12, 1988 transfer of approximately $5,000,000 to First Eastern as a preference. A trial on the preference claim commenced on January 14, 1991. The trial was limited to the issue of whether CSI was insolvent, under § 547(b)(3), on the date it repaid its loan obligation to First Eastern.[4] Although insolvency is presumed under § 547(f), this presumption was rebutted by First Eastern on the first day of trial.[5]

## DISCUSSION

### A. Insolvency:

 Section 101(32) of the Bankruptcy Code defines the term insolvent as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a *fair valuation* . . . ." 11 U.S.C. § 101(32). Thus, generally, to determine the insolvency of the debtor, the traditional balance sheet test is applied. *Jahn v. Fassnacht (In re A. Fassnacht & Sons, Inc.)*, 826 F.2d 458, 462 (6th Cir. 1987). The courts have recognized, however, the difficulty in valuing the assets and liabilities of a debtor on the exact date of a preferential transfer. *In re McLean Industries, Inc.*, 132 B.R. 247, 258 (Bankr. S.D.N.Y.1991); *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir.1980); *Hassan v. Middlesex County Nat. Bank*, 333 F.2d 838, 840 (1st Cir.1964), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964). Thus, courts often utilize the well-established bankruptcy principles of "retrojection" and "projection," which provide for the use of evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date. *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 301 (Bankr. D.Mass.1983), *aff'd*, 776 F.2d 379 (1st Cir. 1985); *Inter–State Nat. Bank of Kansas City v. Luther*, 221 F.2d 382 (10th Cir. 1955), *cert. dismissed*, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956).

Here, the parties looked to CSI's year-end preliminary unaudited trial balance report as of February 29, 1988 ("Preliminary Trial Balance"), CSI's consolidated balance sheet as of June 16, 1988, and the change in the company's financial condition during the interim to determine solvency. However, as a result of Peat Marwick's sudden resignation in May 1988, both parties have challenged the accuracy of the Preliminary Trial Balance, since these records were prepared by and under the supervision of the same group of former officers who pled guilty to a series of charges including bank and securities fraud. Accordingly, at trial the accounting experts for both CSI and First Eastern testified as to the adjustments they deemed necessary to correctly

---

**3.** The security-based actions, which seek in excess of $73,000,000 in damages, are pending before Judge Lechner of the United States District Court for the District of New Jersey. *See Cammer v. Bloom*, 88–2458 (D.N.J.).

**4.** March 16, 1988 serves as the outside date for the 90-day preference period and April 12, 1988 serves as the "Transfer Date."

**5.** *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1322 (9th Cir.1989).

revise the Preliminary Trial Balance.[6] This resulted in a wide range of discrepancies between the parties.

Preliminarily, CSI and First Eastern disagree as to how the assets should be valued. CSI contends that the company was on its "deathbed" on April 12, 1988, and therefore, should be valued on a liquidation basis ("orderly disposition" or "forced sale" standard).[7] CSI alternatively claims that if the deathbed exception does not apply, the best evidence of going concern value is the price obtained from the sale to the Hallwood Group.[8]

First Eastern argues that the deathbed exception does not apply because CSI was a going concern at the transfer date, and therefore, the proper valuation standard should be the fair market value of CSI's assets.[9] Moreover, First Eastern claims that the sale to Hallwood is not indicative of a fair market value because the price received at a bankruptcy sale is not demonstrative of the assets' "fair valuation" for insolvency purposes.[10]

1. Valuation

■ Fair value is not synonymous with a forced sale or the value of a continuing unhampered business. Rather it refers to:

> The amount of money that the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonable prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts.

*Jahn v. Reading Body Works, Inc. (In re A. Fassnacht & Sons, Inc.)*, 45 B.R. 209, 217 (Bankr.E.D.Tenn.1984); *see also In re McLean Industries, Inc.*, 132 B.R. at 258. It is the amount which can be realized from the assets within a reasonable time. *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. at 299. However, if a company is only nominally extant, to treat it as a going concern would be misleading and would "fictionalize the company's true financial condition." *In re Randall Constr.*, 20 B.R. at 184. Therefore, unless a business is on its deathbed, the fair valuation of its assets pursuant to 547(b) is the going concern value or the fair market price. *In re Utility Stationery Stores, Inc.*, 12 B.R. 170, 176 (Bankr.N.D.Ill.1981).

CSI was arguably on or close to its deathbed at or near the time of the transfer. Prior to the unveiling of the massive fraud, CSI struggled to stay in existence in the face of significant cash flow problems. Personal loans from its officers, increased credit lines from its factors, its initial public offering and the loan from BancBoston Financial Company were insufficient to alleviate CSI's cash problems. Ironically, fraud—which was a cause of cash flow problems—was utilized in an attempt to alleviate cash flow problems.

Post-bankruptcy events are also telling. CSI's concerted efforts to reorganize faltered. Nonprofitable subsidiaries were discontinued and many of its assets were sold. Eventually, the salvageable operating assets of the company and both the Kenyon and Cal–Pen subsidiaries were sold to the Hallwood Group for well below C & L's

---

**6.** CSI's accounting expert is Harvey Creem of C & L. First Eastern's accounting expert is Stuart Fleischer. Generally accepted accounting principles ("GAAP") are employed by both parties.

**7.** *See In re Randall Constr., Inc.* 20 B.R. 179, 184 (N.D.Ohio 1981) (nominal existence or on the "deathbed" does not mean value as a going concern); *Mitchell v. Investment Secur. Corp.*, 67 F.2d 669 (5th Cir.1933).

**8.** *See In re O'Neill Enterprises, Inc.*, 359 F.Supp. 940 (W.D.Va.1973).

**9.** *See In re Art Shirt Ltd.*, 93 B.R. 333, 341 (E.D.Pa.1988) (the business must be "wholly in-

operative, defunct or dead on its feet for the deathbed application"); *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 387 (Bankr.D.Minn.1985), *aff'd in part, remanded in part*, 850 F.2d 1275 (8th Cir.1988) (the business does not have to be thriving to receive a going concern value); *Syracuse Engineering Co. v. Haight*, 110 F.2d 468 (2nd Cir.1940) ("fair market price" is the most equitable standard); 2 *Collier on Bankruptcy* 101.32 at 101–110 to 101–111 (15th Edition 1992).

**10.** *See Hunter Press, Inc. v. Connecticut Bank & Trust Co.*, 420 F.Supp. 338, 341 (D.Conn.1976) ("distressed or forced sale price" is not a proper standard for fair valuation purposes).

revised book value as of December 31, 1988.

■ However, a company's assets must be valued at the time of the alleged transfer and not at what they turned out to be worth at some time after the bankruptcy intervened. *Cissel v. First Nat. Bank of Cincinnati,* 476 F.Supp. 474, 484 (S.D.Ohio 1979); *Mutual Savings & Loan Association v. McCants,* 183 F.2d 423 (4th Cir. 1950). On April 12, 1988, the time of the transfer, CSI "appeared" to be operating as a going concern. Nonetheless, the court may consider information "originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date (transfer date)." *In re Chemical Separations Corp.,* 38 B.R. 890, 895 (Bankr.E.D.Tenn.1984). This assures that the valuation is based in reality.

The discovery of ongoing fraudulent acts by CSI's officers and its resulting impact on the company's balance sheet clearly question the appropriateness of treating CSI as a going concern. Nonetheless, First Eastern posits that CSI should be valued as a going concern. First Eastern argues that CSI's analysis uses impermissible hindsight by attributing the effect of the bankruptcy on the company and its assets to a pre-bankruptcy view of the same. First Eastern also points to the fact that Hallwood is operating the assets it purchased as a going concern.[11] It is further asserted that the mere fact that a company is experiencing "serious financial difficulty," *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 735 (1st Cir.1982), does not warrant the abandonment of going concern valuation.

■ "Fair market" or "going concern" value, although presumed to be determined free of impermissible hindsight, is not determined in a vacuum—free of external stimuli. In fact, fair market value presumes that all relevant information is known by seller and buyer. It follows, that a party purchasing assets at the time of the alleged preferential transfer would be aware of all relevant factors, which would include knowledge of a massive business-wide fraud and environmental contamination; otherwise, that party would be the victim of fraud. In sum, fair market valuation entails a hypothetical sale, not a hypothetical company.

■ Thus, it is not improper hindsight for a court to attribute "current circumstances" which may be more correctly defined as "current awareness" or "current discovery" of the existence of a previous set of circumstances. The finding of false accounts receivable, nonexistent inventory and illegal transfers must be taken into account in accurately determining CSI's financial condition at the transfer date. If known, the fact that CSI was never the superior company it portrayed itself as undoubtedly would have restricted the financial assistance it otherwise received. It is inescapable that CSI was beyond normal "serious financial" trouble, it was in a state of financial ruin, which, if not concealed, would have undoubtedly had an effect on asset values similar to that experienced in the bankruptcy proceeding. Further, Hallwood is not only operating the assets it purchased as a going concern, but is operating the assets free and clear of liens, encumbrances and claims that are assertable against Debtor.

2. Adjustments to the Preliminary Trial Balance

The original February 29, 1988 Preliminary Trial Balance ("PTB") on an unaudited consolidated basis listed assets of $122,937,000 and liabilities of $69,153,000.[12] Each party has submitted adjustments it deems necessary in light of the extensive fraud at the company. Plaintiff's initial adjustment is based solely upon application of GAAP to the individual items in the PTB. Plaintiff then provides further ad-

---

11. Notably, First Eastern also argues the converse, *i.e.,* that the Hallwood sale is not indicative of going concern value since it occurred post-bankruptcy filing.

12. *See* Plaintiff Exhibit ("Px") 1, 192 and 193; Defendant Exhibit ("Dx") 34. Note, the balance sheet date used by the parties is February 29, 1988, not April 12.

justment to demonstrate value under an "orderly disposition" valuation (which Plaintiff claims is "fair valuation") and a "forced sale" valuation. Defendant submits its own adjustments under GAAP, which includes a "going concern" valuation or "fair market" valuation.

The analysis of CSI's expert, C & L, is based upon an examination of the books and records of CSI. C & L's GAAP adjustments to assets in the PTB total $63,909,000, resulting in a book value of assets of $59,028,000. The GAAP adjustments to liabilities total $5,808,000, resulting in a book value of liabilities of $63,345,000. Thus, C & L's GAAP adjustments alone yield an equity deficit of $4,317,000 as of February 29, 1988.

On the other hand, First Eastern's expert, Stuart Fleischer, fashioned his analysis upon documents developed and produced by C & L, Peat Marwick, BancBoston and others. Fleischer contends that C & L did not perform an adequate investigation to support the amounts of their writedowns under GAAP, thereby understating the value of CSI's assets. Fleischer asserts that C & L's revised PTB should be adjusted upward by approximately $14,700,000 to $73,100,000. For instance, Fleischer asserts that: (1) inventory was undervalued based upon, in-part, an overstated reserve for dead inventory and an understated valuation for finished goods; (2) C & L improperly devalued assets such as the Dimension Sail Fabric, Inc. joint venture and the goodwill of CSI's subsidiaries on the basis of the bankruptcy itself with the aid of "impermissible hindsight;" (3) C & L understated the fair market value of CSI's real estate holdings in New Jersey; (4) that C & L understated the value of the Kenyon property, plant and equipment by $5,600,000; and (5) C & L improperly overstated CSI's loss in the "roll forward" period.[13]

In its response to Fleischer's allegations, C & L argues (1) that the valuation of inventory was accurately based on CSI's prior accounting history; (2) that no assets were written down on account of CSI's bankruptcy filing; (3) that the value of the New Jersey real estate was correctly based upon actual sales price; and (4) that its valuation of the Kenyon property, plant and equipment properly took into consideration factors that reasonable, prudent and diligent businesspersons would find to be of importance.[14]

The following chart summarizes (in millions) the value of CSI's assets as of February 29, 1988 based upon C & L's (Book, Orderly Disposition, Forced Sale) and Fleischer's (Fair Market Value) proposed adjustments:[15]

| Asset | Book | Orderly Disposition | Forced Sale | FMV |
|---|---|---|---|---|
| Cash & Short–Term Investments | $ 2.3 | $ 2.3 | $ 2.3 | $ 2.3 |
| Net Accts Receivable | 16.0 | 12.5 | 8.2 | 17.8 |
| Costs Incurred on Long Term Contracts in Excess of Related Billings | 1.7 | 0.6 | 0.0 | 1.7 |
| Inventory | 18.9 | 12.2 | 7.4 | 19.8 |
| Prepaid Expenses and Other Current Assets | 0.7 | 0.4 | 0.2 | 0.7 |

13. Fleischer also contends that approximately $10,000,000 in assets must have existed on February 29, 1988, because they were "supposedly" converted into cash subsequent to February 29, 1988, and therefore, should be included in addition to the above stated amount. Fleischer's contentions are centered around a number of illegal transfers made by CSI's officers to accounts outside CSI's accounting control, which were subsequently applied to false receivables. The Court does not find sufficient evidence to support these contentions and, therefore, declines to include them.

14. These factors include the environmental contamination at the Kenyon factory site, the age and condition of the machinery and equipment, and the existence of the massive fraud at CSI.

15. The parties are in agreement that the liabilities of CSI as of the transfer date, excluding shareholders' claims and possible environmental liability, totalled $63,300,000. This assumes that the liabilities remained the same during the time from the Preliminary Trial Balance until the April 12, 1988 transfer.

| Asset | Book | Orderly Disposition | Forced Sale | FMV |
|---|---|---|---|---|
| Property, Plant and Equipment | | | | |
| Coated Sales | 2.3 | 2.3 | 2.3 | 2.6 |
| Coated Aviation | 0.8 | 0.8 | 0.8 | 0.8 |
| Kenyon | 4.4 | 4.0 | 2.4 | 10.0 |
| Other | 0.1 | 0.1 | 0.1 | 0.5 |
| Total | 7.6 | 7.2 | 5.6 | 13.9 |
| Investment in Joint Venture | 0.6 | 0.6 | 0.6 | 3.0 |
| Goodwill | 0.0 | 0.0 | 0.0 | 1.8 |
| Patents | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Non–Current Assets | 0.1 | 0.0 | 0.0 | 1.6 |
| Refundable Income Taxes | 11.1 | 11.1 | 11.1 | 11.1 |
| Total Assets | $59.0 | $46.9 | $35.4 | $73.7 |

3. Court's Analysis of the Suggested Adjustments

The Court must first address certain adjustments proposed by both parties before deciding on CSI's solvency.[16]

a. *Kenyon Facility*

■■■ In response to First Eastern's claim that the Kenyon property, plant and equipment were undervalued by $5,600,000, the Court finds otherwise. Although a sale is fundamentally the best evidence of a property's value, a firm commitment to buy at a certain price is also considered probative. *In re Energy Cooperative., Inc.,* 109 B.R. at 828. In the case at bar, CSI not only sold Kenyon assets as part of the Hallwood Group Purchase, but prior, received two other offers, both within the $4,000,000 range.[17] In fact, Hallwood's original offer placed a value on the Kenyon property, plant and equipment, excluding the contaminated landfill site, at approximately $3,400,000. In all three cases, the offers were in some fashion conditioned upon the positive environmental status of the Kenyon real property.

In addition, the reliance of First Eastern's experts upon the 1986 Manufacturer's Appraisal Company appraisal ("1986 Appraisal") is misplaced, since neither it, nor any of the subsequent valuation efforts adequately accounted for the potential environmental liability at Kenyon. Although CSI's own expert, Alan Cohen, relied upon the 1986 Appraisal in evaluating the Kenyon real property, he later testified that he was unaware at the time he used the appraisal of any contamination at Kenyon.[18] In fact, the 1986 Appraisal made no mention of Kenyon's environmental problems, thus, its reliability is doubtful.

Furthermore, the testimony of Dennis Farley, First Eastern's environmental expert, which takes up several hundred pages of transcript, is most neatly summed up in two colloquys between Mr. Farley and CSI's counsel during cross-examination:

Q: Sitting here today, is it your opinion that there is a greater than fifty percent chance or a less than fifty percent chance that the owner of the Kenyon factory site is going to be required to do cleanup work in the future?

16. This Court notes, as did the court in *In re Energy Cooperative., Inc.,* 109 B.R. 822 (N.D.Ill. 1989), that "[t]here appears to be an increasing willingness on the part of experts retained for trial to testify in accordance with the wishes of the party retaining them, with not even the slightest momentary embarrassment...." *Id.* at 829.

17. Exeter Capital offered to purchase Kenyon's property, plant and equipment among other assets for approximately $4,500,000. Philip Morris Group offered to purchase Kenyon's property, plant, equipment and inventory, excluding the landfill site, for approximately $5,000,000.

18. Alan Cohen of Alco Capital Corp. is CSI's valuation expert.

A: I'd say greater than fifty percent. *Tr.* at 2328.

Q: Two more questions, Mr. Farley, I think.

[I]f the company came to you . . . showed you the AET report and asked you whether you would recommend that they . . . buy the Kenyon factory site, what would you advise them?

A: Well, consultants specifically write these reports and qualify themselves so they don't have to answer that question.

Q: Okay. But they say to you now, "Dennis, I know what you wrote in your written report, but I'm paying you, and we're not now talking about what's in here, I'm just asking you, should I buy this facility?" What would you tell them?

A: I would tell them that there is some environmental contamination issues there that have to be dealt with through some further work; "They don't appear to be overly significant, but they do have to be addressed," and that through some additional investigatory work a more defined clean-up figure could—could likely be quantified for them.

*Tr.* at 2442.

Farley further testified that the report issued by Applied Environmental Technologies ("AET Report"), an environmental consultant hired by Hallwood, did not "fully delineate the extent of [the] contamination at the [Kenyon] facility." [19] The AET Report presented a summary as to whether there was any evidence of contamination on the Kenyon site, resulting from present or past activities at the site. Although the AET Report concluded that there were low levels of soil and groundwater contamination, the report was not intended to provide a complete compliance audit of the facility with respect to all federal, state or local environmental laws or regulations. [20]

Under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, liability is not assessed by the Environmental Protection Agency ("EPA") until it investigates a site, decides the response actions which are necessary, and determines which potentially responsible parties will bear costs. *In Re Chateaugay Corp.*, 112 B.R. 513, 521 (D.S.D.N.Y.1990), *aff'd*, 944 F.2d 997 (2nd Cir.1991). In 1987, the State of Rhode Island initiated CERCLA actions against the Kenyon landfill. The State recommended to the EPA that a listing inspection be performed, in order to determine if the Kenyon site warrants placement on the National Priorities List ("NPL"). [21] Since conducting its listing inspection in 1988, the EPA has not made a final determination regarding cleanup costs at the landfill. However, David Nichols, a hydrogeologist and CSI's environmental consultant, testified that cleanup costs could range from $1,000,000 to as much as $10,000,000, depending on the cleanup method applied and whether Kenyon is placed on the NPL.

In the Court's view, the battle of the environmental experts was won by CSI. Rhode Island has acted, CSI presented persuasive evidence of contamination, and First Eastern's expert did not refute same other than to exclaim that he was unaware to what extent the site was contaminated, and therefore, could not agree with CSI's expert assessment of the likelihood that the site will be placed on the NPL and what required cleanup costs might be. The important result here is the unanimous realization that a problem exists with potential for liability.

However, First Eastern also contends that Hallwood Group's "carve out" of the contaminated Kenyon landfill had the effect of eliminating Hallwood from any potential environmental liability, and thus, had no impact on the value of Kenyon's other assets. First Eastern argues that there is no reason why someone else buying the assets outside of bankruptcy in

**19.** *Tr.* at 2325–26.

**20.** *See* Dx 108.

**21.** It should be noted that "Congress did not intend listing on the NPL to be a requisite to all [CERCLA] response actions." *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1047 (2nd Cir.1985).

April of 1988 could not have done the same thing. First Eastern's argument assumes that outside of bankruptcy, CSI would have been able to sell Kenyon's assets, excluding the landfill without liability attaching to either buyer or seller. It also assumes that at the time of the transfer, a reasonable and diligent purchaser would have paid substantially more than the Hallwood Group for Kenyon's assets, despite potential environmental liability. Again, First Eastern glosses over the fact that if liability is determined, *someone* will have to bear it.

Despite there not being any subsequent environmental action against the Kenyon site as of the trial, under 42 U.S.C.A. § 9607(a)(1) and (2), potentially responsible parties include "the owner and operator of a ... facility [and] ... any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." Here, CSI owned and operated both the landfill and factory site at the time of the contamination. The Hallwood Group is the current owner of the factory site. Courts have generally held that the liability provisions of CERCLA should be broadly construed, *In re T.P. Long Chemical, Inc.*, 45 B.R. 278, 283 (Bankr.N.D.Ohio 1985), and therefore, both CSI and Hallwood are potentially responsible parties. *See In re Sterling Steel Treating, Inc.*, 94 B.R. 924 (Bankr.E.D.Mich.1989).

Even the great powers afforded to a debtor under bankruptcy, such as abandonment under § 544 or sale of assets under § 363, cannot free the debtor of its liability related to environmental violations. In *In re Wall Tube and Metal Products Co.*, 56 B.R. 918 (Bankr.E.D.Tenn.1986), *rev'd and remanded on other grounds*, 831 F.2d 118 (6th Cir.1987), the court held that to the extent that an "estate [has] already incurred liability or the potential for liability ... that liability could in no way be transferred or eliminated by the simple act of conveying the property out of the estate." *Id.* at 923. This, combined with the fact that a reasonable and diligent purchaser would have discovered environmental problems similar to those discovered by the Hallwood Group weakens First Eastern's argument. To believe that liabilities associated with the Kenyon landfill had no effect on the fair value of Kenyon's factory site, because one could just "carve out" the contaminated landfill from the sale of substantially all of Kenyon's other properties is unfounded.

In the final analysis, sophisticated valuation methods and environmental analyses by experts must yield to the realities of the marketplace.[22] Therefore, any upwards adjustment to the valuation of Kenyon would be unrealistic under the state of affairs that existed at the time of the transfer and the present.

### b. Goodwill

First Eastern's assertion that CSI's subsidiaries carried goodwill in the aggregate amount of $1,780,000 is tenuous at best. Goodwill not only represents the favorable consideration shown by the public, but it is the ability of a business to generate income in excess of normal rates. *Blacks Law Dictionary* 694 (6th Ed.1991). At the time of the transfer, the subsidiaries were in financial despair, clinging to a parent whose sound financial condition was a falsehood. None of the subsidiaries were operating at a profit, rationalizing that no potential buyer offered more than the reasonable value of the tangible assets.

### c. Joint Venture

Furthermore, First Eastern's belief that CSI could have sold its share of Dimension Sail Fabric, Inc., a joint venture with Dimension Sail Cloth, Inc., for $2,950,000 on April 12, 1988 is unsupported by the record.[23] First Eastern argued that since CSI had invested nearly $3 million in the

---

**22.** *In re Energy Cooperative., Inc.*, 109 B.R. at 830.

**23.** C & L's valuation of $600,000 is more realistic, as it is based on the settlement agreement between CSI and Dimension Sail Cloth, Inc. regarding CSI's original investment in the venture. *See* Px 65, 66.

venture shortly before the PTB date, the venture "must" have been worth at least that much. However, the agreement was based upon CSI's ability to, among other things, provide $9,000,000 in working capital and finishing services on a priority basis. With the discovery of its officers' massive fraud, it became apparent that CSI would be unable to meet its ongoing contractual obligations.[24] Further, Dimension Sail Fabric was unable to obtain additional financing since its assets were secured by CSI's loan to the joint venture. In addition, suppliers were unwilling to ship raw materials since CSI was unable to provide additional needed financing, causing Dimension Sail Fabric's payables to become further past due. In fact, further findings would reveal that the CSI–Dimension joint venture was untenable from its very beginning.[25] Thus, these financial encumbrances, combined with a very limited industry, justifies C & L's valuation of CSI's share in Dimension Sail Fabric.

### d. Net Accounts Receivable

The original PTB of the Debtor listed net accounts receivable as $48.7 million. C & L's GAAP analysis of same resulted in an adjusted net accounts receivable of $16.1 million. The adjustment included a $31.2 million writeoff for false accounts receivable; a net addition of $336,000 based upon $44,000 deduction for uncollectible invoices (old), and an add-back of $380,000 to account for government contract billings that were under-recorded; and, an addition to the bad-debt reserve for uncollectible receivables of $1.8 million. Defendant only challenges the adjustment with regard to the bad-debt reserve, arguing that it is overstated by $1.8 million.

C & L determined that the reserve for uncollectible amounts to be recorded against gross accounts receivable as of February 29, 1988 was $2,199,000 consisting of a $352,000 reserve and a $1,847,000 reserve. The reserve of $352,000 was based on a review of $423,000 of apparently valid accounts receivable recorded as of February 29, 1988, which were still outstanding and to be of doubtful collectibility in September 1988.[26]

The second allotment of the bad debt reserve, to which Defendant objects, was a writeoff by C & L of $1,847,000 for accounts receivable outstanding as of February 29, 1988, which were written off by C & L after February 29, 1988 through the issuance of credits. An investigation revealed that the credits either (1) should have been issued before February 1988 or (2) were issued against uncollectible receivables. Tr. at 1128–29.

First Eastern contests the validity of this latter segment of the reserve for doubtful accounts. First Eastern believes that the writedowns were the result of improper hindsight based on the fact of the bankruptcy itself. Specifically, that C & L assumed that any debt that was bad after the petition was filed was bad before bankruptcy.

The testimonial evidence offered at trial established that the creation of the bad debt reserve was based upon two discreet problem areas. One area concerned the issuance of credits based upon disputes which arose before February 29, 1988. The second area concerned the issuance of credits based upon advance billings that were credited-out after February 29, 1988, but related to the pre-February 29 period. C & L derived the numbers through extensive investigation of the records of CSI, as well as discussions with the credit manager of the company and others. See Tr. at 1129–35.

---

**24.** First Eastern's own expert accountant testified that CSI did not possess sufficient cash flow at the time of the transfer to meet its working capital commitments. Transcript at 1853–54 ("Tr.").

**25.** First Eastern's own expert accountant acknowledged that CSI provided materially false financial information from the very beginning

of the venture. Tr. at 1851–52. Furthermore, BancBoston's senior credit officer testified that the venture had lost money since its inception. Tr. at 98.

**26.** Approximately $70,000 of the receivables was collected during this time frame. Hence, $352,000 not $423,000. Tr. at 1128.

On the other hand, First Eastern's expert did not engage in any independent investigation of the facts and circumstances surrounding this portion of the bad debt reserve, but rather, merely reviewed the work papers of C & L and opined that they did not contain sufficient information to justify the write-downs. *See, e.g., Tr.* at 1778–81.

First Eastern's argues that the writedowns were a direct result of the bankruptcy filing, which is an improper application of the GAAP principle that permits the adjustment of a financial statement based upon events that occurred subsequent to the balance sheet date if they provide evidence with respect to "conditions that existed" at the date of the balance sheet. The argument continues that bankruptcy is not a "condition that existed" at the balance sheet date.

First Eastern's reasoning is off the mark, here. The bankruptcy of CSI was not the result of a sluggish economy, overleveraging or whim of the marketplace, rather, it was the revelation of a massive fraud. It was this revelation which set off the race to the courts by CSI's lenders and the refusal of suppliers to ship materials. The filing of the bankruptcy did not in and of itself lead to the uncollectibility of the receivables (which presumes the receivables were legitimate). In fact, the intent of the filing was to restore order and confidence.[27] So, for First Eastern to blame the filing for the uncollectibility of receivables is unrealistic. At best, the bankruptcy filing acted as a tourniquet, at worst it was a successive cause of a pre-existing injury.

### e. Inventory

The original PTB listed CSI's consolidated book inventory at an aggregate value of $47,835,000 before any reserve for obsolescence. Dx 34; Px 1. The original books reserved $560,000 for obsolescence. *Id.* C & L's adjustments to these figures include a $25,835,000 writeoff for nonexistent inventory, which was not contested by First Eastern, a $339,000 writeoff for inventory purportedly located at Westmont Industries, Inc., which either did not exist or was not recoverable, and an increase in the reserve for obsolescence to $2,768,000. Only the latter two adjustments have been challenged by First Eastern.

The evidence established at trial suggests that the writedown of the Westmont inventory was appropriate. Westmont was a "finisher" that CSI had business dealings with, and at some point negotiations for the purchase of Westmont by CSI took place. However, the negotiations soured and CSI management moved its inventory out of Westmont for fear that it would be held by Westmont and that Westmont was going out of business. *Tr.* at 403–04. Westmont subsequently brought suit against CSI for breach of contract and other damages. *See* Dx 30, Letter from Fischer and Kagan, counsel to CSI, to Peat, Marwick, Main & Co., May 3, 1988.

It was not clear whether the CSI employees who removed the Westmont inventory completed their task in its entirety because the recovery of the Westmont inventory was not conducted under the supervision of the individual who was in charge of inventory records at CSI, Richard Kopleson. *Tr.* at 691. CSI's books reflected a remaining inventory valued in the $300,000 range. However, subsequent attempts to survey Westmont to ascertain if any inventory remained were thwarted by the fact that it was now under new ownership. Further complicating the task was the litigation between the parties. CSI had counterclaimed for the alleged inventory retained by Westmont and damages. In an opinion letter by CSI's counsel to its auditors which discussed pending litigation, counsel stated that the "collectability of such judgment [against Westmont] is somewhat in doubt." Dx 30.

---

**27.** It is beyond peradventure that the filing for bankruptcy protection often affects the collectibility of receivables; however, it is equally true that bankruptcy does not have the stigma attached to it that it did in the past. In fact, creditors of an insolvent company often prefer that a company file for bankruptcy protection so that order can be restored while the debtor works out its problems, and that prospective dealings between the parties have administrative expense protection.

Relatedly, the original PTB recorded a "chargeback" against Westmont in the amount of $323,000, which C & L eliminated in its writedown and First Eastern seeks to preserve. This claim was also part of the countersuit brought against Westmont, of which CSI's counsel stated the collectibility of same was somewhat dubious. *Id.*

The Westmont-related assets were properly written down by CSI. First Eastern offered no substantive support for its belief that these entries remain as stated in the original PTB. Further, as of the commencement of the instant proceeding, the Westmont-related assets had not been recovered.

The other area of dispute concerns the amount of the adjustment to the reserve for obsolescence. The original PTB listed a reserve of $560,000, but C & L has increased the reserve to $2,768,000 in light of CSI's policy of perpetually retaining dead inventory and carrying it on the books at original cost. *See, e.g., Tr.* at 699–705. The reserve was comprised of two parts: $1,816,000, which was a writedown of inventory purchased before February 29, 1988 and still on hand as of November 30, 1988, and $952,000, which was an estimation of the loss on sales during the same period.

For example, Richard Kopleson testified that one type of "dead" fabric was perpetually carried on the books at $8.75 to $9.00 per yard even though when it became dead inventory it would be worth only ten to fifteen cents per yard, and in fact, Brookwood Companies, a successor to CSI, was still holding such inventory due to an inability to sell it. *Tr.* at 702–04. Kopleson further testified that in the nearly four years that he worked for CSI, "they never wrote down any of their inventory." *Tr.* at 703.

Nonetheless, on cross examination of Harvey Creem of C & L regarding the $1.8 million portion of the obsolescence reserve, First Eastern adduced that C & L thought that a $1.5 million reserve would be sufficient. *Tr.* at 1398–99. Specifically, C & L concluded that the reserve could be reduced by $323,000. *Id.* The fact that certain inventory which was written down, subsequently sold for a greater amount lends credence to First Eastern's argument on this adjustment.

First Eastern further contended that the value of CSI's finished goods inventory should be increased by $280,000 over the book value. First Eastern's expert, Stuart Fleischer, asserted that (1) some inventory purchased prior to February 29 was not dead inventory according to the definition of dead inventory as supplied in the testimony of Kopleson, and (2) some of the written down inventory sold for more than the writedown amount. Fleischer added a margin of approximately 8½% to this finished goods inventory that he asserts was not dead inventory, and came up with the $280,000 addition.

The flaw in Fleischer's analysis is that a large portion of the finished goods inventory "was special purpose product for a special purpose customer," *Tr.* at 835, and thus, it is unlikely that such inventory would be suitable for sale to other customers. Therefore, the Court is not convinced that the finished goods inventory should even be valued at cost, let alone above cost with an 8½% mark-up.

The net result of the adjustments to inventory is a $323,000 increase in the value of the Debtor's assets based on a corresponding reduction to the reserve for obsolescence.

### f. Capitalized Computer Development Costs

The original PTB carried $168,000 in capitalized computer development costs. It appears that the costs were incurred for consulting fees in connection with the development of a computerized inventory system. *Tr.* at 1425. C & L wrote off this amount entirely because the system was never developed and it appeared that the project had been terminated prior to the bankruptcy. *Tr.* at 1203–04, 1425–26.

First Eastern challenged the writeoff, arguing that the deduction was improper because the decision to abandon the project was made after the bankruptcy. However,

on cross examination, Fleischer testified that he did not know when the project was aborted and was unable to offer any convincing testimony that the capitalized costs had any real value. *Tr.* at 1830–32.

### g. Industrial Revenue Bond Capitalized Finance Costs

■ Prior to the bankruptcy, CSI had engaged in a borrowing and issued an industrial revenue bond. In conformity with generally accepted accounting principles, CSI capitalized the costs incurred in obtaining the financing. The accounting theory of capitalization is that costs associated with a long term borrowing should be amortized (capitalized) over the life of the borrowing to properly reflect the true interest cost associated with the borrowing.

C & L wrote down $232,000 of the capitalized financing costs based upon defaults by CSI under the bond indenture which would give the bondholders and indenture trustee the right to accelerate the indebtedness. Fleischer contended that since the bonds had not in fact been called, it was inappropriate to writeoff the capitalized costs. *Tr.* at 1553.

Fleischer did not challenge the fact that CSI was in violation of the indenture covenants, but argued that the indenture trustee would be required to make a demand for cure of the default and have it denied before the bond would be considered a current obligation. *Tr.* at 1553, 1821. However, Fleischer's contention did not withstand cross examination. CSI recited the provisions of Financial Accounting Standard 78 ("FAS") which stated that a long term obligation should be classified as a current liability if it "[is] or will be callable by the creditor either because the debtor's violation of a provision of the debt agreement at the balance sheet date makes the obligation callable, or because the violation, if not cured within a specified grace period, will make the obligation callable." *Tr.* at 1823. Fleischer agreed that the FAS 78 applied; however, he unconvincingly ex-

plained that he believed the indenture trustee had to do "something" before the debt would be callable. *Tr.* at 1823–24. Fleischer conceded that the language of FAS 78 did not contain any such requirement. *Tr.* at 1825.

### h. Coating Machine

■ First Eastern objected to the $339,-000 writedown of certain equipment at the company's facility in Hazlet, New Jersey.[28] First Eastern alleged that the writedown resulted from improper hindsight based upon the fact of the bankruptcy.

The focus of the dispute concerned the value of a secondhand coating machine that CSI had purchased for the production of non-slip placemats for airline use. *Tr.* at 436. However, the new business never really got off the ground. Richard Bober, former director and officer of CSI, testified that "we [ (CSI) ] were not as competitive as we thought with the product [ (non-slip placemat) ], so by the time we got our machine [ (coating machine) ] going in New Jersey, we were really ... going out of business." *Tr.* at 437. Bober further testified that the company could not find any use for the equipment, due in part to the fact that "it was not the latest technology." *Tr.* at 438.

Fleischer could not opine as to the value of the secondhand machine, *Tr.* at 1843, which was still not sold as of the commencement of this trial.

The Court is not convinced one way or the other by the testimony offered as to the coating machine; however, the fact that the machinery is still not sold, despite efforts to squeeze every penny out of this debtor for the benefit of the estate, is telling. Since the equipment is still not sold and was not being used in any productive manner before the bankruptcy, it is difficult for the Court to envision that a purchaser would have paid for the machinery pre-bankruptcy or attributed value to the machinery as part of an asset sale.

**28.** The $339,000 writedown is comprised of a $20,000 reduction in the book value of a "Stork" machine to reflect actual sales price. *Tr.* at

1212. The remaining $319,000 related to the coating machine.

### i. Fixed Assets and Leasehold Improvements at Laurence Harbor

 First Eastern contested the writeoff of $115,000 of the book value of office furniture and fixtures and $33,000 for leasehold improvements at the company's leased premises in Laurence Harbor, New Jersey. First Eastern again argues that the writedown was based improperly on the fact of the bankruptcy, and thus, is inapplicable to the value at the relevant dates (February 29 or April 12).

However, on cross examination, Fleischer admitted that furniture, fixtures and leasehold improvements are usually carried on a company's books at greater than market value even though they could only be sold on a liquidation value basis. *Tr.* at 1882. Fleischer further agreed that if CSI had been unable to sell the furniture, fixtures and leasehold improvements as of the trial, it is unlikely that they could have received anything for it at an earlier date. *Tr.* at 1883. With regard to the $33,000 of leasehold improvements, Fleischer admitted that they would have no value if the lease was not purchased. *Tr.* at 1884. The lease was not purchased.

The Court believes that the adjustments made by the Debtor are appropriate.

### j. Real Property

 CSI owned an office building in Hazlet, New Jersey, where its headquarters were based, and a condominium in Red Bank, New Jersey. First Eastern contends that CSI undervalued the two parcels by $279,000, by valuing the parcels at what they eventually sold for in 1989 and 1990, rather than accepting valuation appraisals from 1988. Specifically, First Eastern argued that the real estate market was in better shape in 1988 than in 1989 and 1990, and therefore, it is unfair to value the property at the subsequent sale dates.

In October 1988, at the request of the administrative vice president of CSI, City Appraisal Services, Inc. appraised the Hazlet facility at $1,750,000 market value. *See* Dx 18, 22A and 99, appendix C. John Parker of Ernst & Young, First Eastern's valuation expert, testified that it was his opinion that the appraisal was a reasonable reflection of the value of the property based on the methodology employed by the appraisal service. *Tr.* at 2630. However, after extensive marketing of the Hazlet property after the commencement of the bankruptcy by both the debtor and then Hallwood, the property only sold for $1,445,000, *Tr.* at 1433, which was $249,000 more than C & L had valued the property at prior to the sale. In July and December of 1988, offers to purchase the Hazlet facility for $875,000 were made.

In sum, the Court has to decide whether to accord greater weight to the assertions in a document, even though the document's creator was not called as a witness at trial, or to an actual sale made subsequent to the dates relevant to the Court's ultimate inquiry, which may have been tainted by a liquidation mindset.

The Court believes that under the circumstances, it is appropriate to "tear the baby in half." Accordingly, the Court determines that the fair market value of the Hazlet facility as of April 1988 was $1,597,500, which is $102,500 increase over that ascribed by C & L.

The other property, the Red Bank Condominium was valued at $150,000 because that is what it brought at sale in mid–1990, after almost a year and a half on the market. *Tr.* at 1033. Again, First Eastern argued that the price derived at such a time-removed sale was not indicative of the parcel's fair value at the time of the alleged preference.

In contrast, First Eastern offered an appraisal report of another non-witness, which had been prepared at the direction of a CSI officer in July 1988. Dx 19. The report stated that the market value of the condominium was $204,000. *Id.* at 000537.

The Court is faced with the same problem as above. Interestingly, the appraisal suggests that the property be offered for sale in the $195,000 to $205,000 range, which seems inconsistent with the market value ascribed to the parcel in the same report. Therefore, taking the lower range of the appraisal, and splitting the differ-

ence with actual sales price, it is the Court's determination that the market value of the condominium at the preference date was $172,500, which is $22,500 higher than the value assigned by C & L.[29]

4. The Roll Forward Period

The roll forward period is the time period between the February 29, 1988 PTB and the June 16, 1988 bankruptcy filing date. Based on available information concerning CSI's sales, for which daily records existed, the average gross margins and the total operating expenses incurred during the three and a half month period, C & L estimated that the company experienced a loss of approximately $2.5 million during the period March 1, 1988 through the transfer date of April 12, 1988.[30] First Eastern contends that C & L overstated the loss for the March 1, 1988 to April 12, 1988 period by over $1 million, and that $1.1 million, not $2.5 million, should be deducted from net worth for that period.

For the entire roll forward period, C & L asserted that CSI had consolidated losses of $5,159,000 on consolidated sales of $35,611,000. Of these amounts, CSI—the parent—experienced sales of $26,056,000, with a net loss of $5,186,000. First Eastern contends that C & L did not properly allocate the portion of the total sales attributable to the March 1—April 12 period, and urged particularly that although that period represents 40% of the total time, C & L allocated only 11.5% of the total sales to the pre-transfer period. The implication is that C & L improperly allocated sales to increase the loss in the pre-transfer period. To support this view, at trial, First Eastern elicited testimony that C & L, in reviewing the daily sales journal, omitted certain actual sales that took place during the pre-transfer period.[31] Thus, on a properly apportioned basis, First Eastern contends that the sales attributable to the pre-transfer period should be equal to 40% of the total (approximately $10 million, contrasted with $3 million per C & L).

First Eastern also contends that the $2.5 million was arrived at by improper calculation of the loss by C & L over the period of March 1 to April 15, rather than March 1 to April 12. This, according to First Eastern, had the effect of erroneously increasing the size of the loss during the relevant period and hence the size of the deduction from CSI's net worth as of April 12.

Finally, First Eastern asserts that in determining the loss amounts above, C & L improperly allocated $1,702,000 in professional expenses over the entire roll forward period, when most, if not all, were accrued after April 12.

Pursuant to the evidence adduced at trial, CSI revised its calculations and reduced the net loss for the pre-transfer period by $287,000 to $2.2 million. First, as for the objections raised by Defendant concerning the actual sales occurring prior to April 12, Plaintiff has added $233,000 in sales to the pre-transfer period based upon C & L's incorrect exclusion of invoices dated prior to April 12 but entered later in the month.[32] The Court has reviewed the exhibit relied upon to ascertain the invoice amounts that C & L mistakenly omitted and, provided the Court has not misunderstood the focus of the litigants, finds that $545,500 of sales should be added to the pre-transfer period. Nonetheless, this difference may prove to have little practical effect. If CSI's actual gross margin was 3%,[33] Plaintiff's add-back results in a pre-transfer increase in net worth of $7,000, whereas the Court's add-back results in a $16,365 increase in net worth. However, it is a far cry from the

---

**29.** The Court acknowledges its own "gut feeling" that the values ascribed by it may be on the high side.

**30.** In the pre-trial order submitted in this proceeding, C & L originally estimated the loss incurred during this period as $2.5 million; however this amount was modified to $2.2 million at trial.

**31.** See Tr. at 1313–24; Dx 104.

**32.** See Dx 104. Admittedly, C & L mistakenly looked at the "system date" in the daily sales journal rather than the individual invoice dates to allocate sales. The adjustments also include a correction based upon the change of date used by C & L, April 15, to April 12.

**33.** See Tr. at 1495–96.

$10 million add-back suggested by Defendant based upon a pure proportionate basis.

Further, CSI has reallocated the professional expenses. First, $268,000 was reallocated from the pre-transfer period because they related to the post-transfer period. Second, the pre-transfer loss period was increased by the $150,000 in fees of Wertheim, Schroder which had been allocated over the entire roll forward period and were reallocated entirely to the pre-transfer period. Originally, C & L had proportionately allocated these expenses over the entire roll forward period, with minor exceptions. If based purely upon proportionate allocation, the pre-transfer period is allocated $677,000 and the post-transfer period $1,025,000. However, evidence adduced at trial revealed that certain expenditures were clearly allocable to the "pre" or "post" transfer period. Specifically, investment banking fees of $250,000 are pre-transfer expenses, whereas $670,000 in crisis fees were incurred post transfer. The remainder may be allocated proportionately, $311,000 pre-transfer and $471,000 post transfer. Thus, under this Court's analysis, the proper allocation of these expenses is $561,000 pre-transfer and $1,141,000 post transfer.

In sum, if the Court's analysis is correct, $292,400 should be deducted from the net loss of $2.5 million for the pre-transfer roll forward period, which is in line with Plaintiff's admission that it should be reduced to $2.2 million.

5. Shareholder Liability for Securities Fraud

Finally, CSI asserts that the contingent securities fraud claims that existed on April 12, 1988, which may reach upwards of $36,000,000 according to CSI's expert, should be included as debt in the insolvency analysis. CSI argues that since contingent claims, such as choses in action, are treated by courts as debts for insolvency purposes,[34] there is no reason the court should treat a securities fraud action differently. The Court does not have to reach this issue in light of the foregoing portions of this opinion, which find that Debtor was insolvent at the transfer date.

### CONCLUSION

Taking into consideration the adjustments that the Court feels were necessary and reasonable under the circumstances, the Court finds that, irrespective of the valuation method applied, CSI was insolvent at the time of the transfer.[35] CSI's analysis led to an adjusted book value of the company of <$4,317,000>, based upon assets of $59,028,000 and liabilities of $63,345,000. The Court's adjustments to the book value numbers are as follows: (1) inventory increased by $323,000; (2) Hazlet facility increased by $102,500; (3) Red Bank condominium increased by $22,500; (4) roll forward period decrease in amount of net loss by $292,400.

In sum, these adjustments add only about $740,000 to decrease the insolvency of CSI on a book value basis to $3,576,600. Thus the Court does not think it necessary to look at values on an "orderly disposition" or "forced sale" basis, which, if adopted by the Court, would only increase the amount of the insolvency.

---

**34.** *See In re Sierra Steel, Inc.,* 96 B.R. 275 (9th Cir. BAP 1989); *In re Kucharek,* 79 B.R. 393 (Bankr.E.D.Wis.1987); *In re Storage Technology Corp.,* 51 B.R. 206 (D.Colo.1985).

**35.** This court's finding is substantiated by the evidence, despite financial inconsistencies between the joint pre-trial order and the parties' memoranda of law.